[No. H031129. Sixth Dist. May 23, 2008.]

OCEAN HARBOR HOUSE HOMEOWNERS ASSOCIATION, Plaintiff and Appellant, v.
CALIFORNIA COASTAL COMMISSION, Defendant and Respondent.

**COUNSEL**

Pacific Legal Foundation, Meriem L. Hubbard and Timothy Sandefur for Plaintiff and Appellant.

Edmund G. Brown, Jr., Attorney General, J. Matthew Rodriguez, Assistant Attorney General, Joseph Barbieri and Christiana Tiedemann, Deputy Attorneys General, for Defendant and Respondent.

**OPINION**

**RUSHING, P. J.—**

### STATEMENT OF THE CASE

Plaintiff Ocean Harbor House Homeowners Association (Homeowners) sought a coastal development permit from defendant California Coastal Commission (the Commission) to build a seawall to protect their condominium complex from erosion that threatened its structural integrity. The Commission granted the permit but as a condition required Homeowners to pay a fee to mitigate the loss of an acre of beach, the fee to be used toward the purchase of beach property elsewhere. Homeowners challenged the fee by

petition for a writ of administrative mandate (Code Civ. Proc., § 1094.5), but the trial court denied the writ. Homeowners now appeals from the judgment. It claims that (1) the fee is an unconstitutional taking because there is no nexus or rough proportionality between it and the projected impact of the seawall; (2) the Commission lacked statutory authority to impose the fee; (3) the fee is not supported by substantial evidence; and (4) the Commission arbitrarily increased the amount of the fee.

We find no merit to these claims and affirm the judgment.

### THE ADMINISTRATIVE PROCEEDINGS

Ocean Harbor House is a 172-unit, multibuilding condominium complex on Del Monte Beach fronting Monterey Bay in the City of Monterey (the City). It was built in the late 1960's and mid-1970's, and since the mid-1980's, the seaward buildings have been threatened by storms, high water level, and shoreline erosion. Homeowners tried various measures to prevent erosion and destabilization, but the measures proved to be inadequate. Finally, to secure more permanent protection, Homeowners applied to the City and the Commission for permits to build a 585-foot seawall.

The Monterey Planning Division prepared an environmental impact report (EIR). It stated that water hitting the seawall would contribute to a "[p]eninsula [e]ffect," which meant that the beach on each side of the complex would slowly erode and the complex would be left protruding out from the shore. The EIR concluded that the erosion due to the seawall would cause "a substantial negative aesthetic impact to, or 'sense of loss' of, the existing visual character of the site and its surroundings," visually break the continuity of a two-mile stretch of beach, prevent visitors from walking its entire length, and reduce recreational use.

After considering alternatives to a seawall and different types of mitigation, the EIR concluded that there was no feasible way to mitigate "[p]eninsula [e]ffect" or the visual impact of the seawall. However, the loss of continuous lateral access could be mitigated if Homeowners provided alternative access through the parking lot behind the complex. The EIR considered that loss of recreational use to be insignificant because large stretches of beach would remain.

The City granted a permit but required that Homeowners provide alternate lateral access and design the seawall to resemble the natural landscape.

After obtaining the City's approval, Homeowners turned to the Commission. A report by Commission staff concluded that there was no feasible alternative

to a seawall that could both protect the complex and remain consistent with the California Coastal Act of 1976 (Pub. Resources Code, § 30000 et seq. (the Act)), which allows seawalls if necessary to protect existing structures. (Pub. Resources Code, § 30235.)[1] Accordingly, the report recommended granting the permit with conditions.

The report noted that the seawall would ultimately cause an acre of beach to erode with an attendant loss of lateral access along the beach and recreational use. The loss of lateral access could be partially mitigated by requiring access through the complex's parking lot, but it would not be "qualitatively equivalent" to continuous access along the beach. On the other hand, there was no feasible way to mitigate the loss of beach at the site. The existing beach could not be maintained, new beach could not be created, and there was no new potential public recreational land in the area to mitigate the loss at the site. However, the report opined that without mitigation for this impact, the project could not be deemed consistent with the Act, which required the Commission "to protect maximum public access and recreation to and along the shoreline." Consequently, the report recommended an in-lieu mitigation fee to be used to buy beach property in the southern Monterey Bay area for public recreational use. The report also recommended a number of other conditions, including lateral access through the complex's parking lot, as required by the City.

The report discussed three methods to determine the value of the acre of beach that would be lost and thus the amount of the mitigation fee. Each method considered the loss of beach from a different perspective. One method—the sand-replacement method—based the fee on the cost of buying enough sand to cover an acre of beach, which, based on the market price of sand, was somewhere between $1,031,400 and $1,206,900. The report noted that this approach addressed the loss of sand but not the value of public access and recreational use that would also be lost. Moreover, this method underestimated the loss because "[t]o retain the beach in front of the [complex], this mitigation would have to be repeated numerous times over the 50-year life of the project because high tides and storm-surge wave run-up would regularly remove this sand from the beach."

The second method—the real estate value method—based the fee on the price of a comparable acre of beachfront property. According to the report, this method "directly reflects land values, which is the impact in question, and is based on resources in the vicinity of the project." The report noted that the price would vary depending on the property's location and "developability." However, using data on sales in the Monterey area, the report estimated that it would cost $1 million to purchase an acre in the area.

---

[1] All unspecified statutory references are to the Public Resources Code.

The third method—the economic recreational value method—based the fee on the recreational value of the acre of beach. The report cited numerous economic studies and analytical guides on how to quantify the value of recreational use using certain types of expenditures by visitors as a reflection of value.[2] Based on data in certain studies, the report concluded that a reasonable, if not conservative, estimate of the recreational value of the Monterey beach was $13 per person per visit. Using that figure and state park data showing 968,287 annual visitors, the report calculated the recreational value of the entire 60.6-acre beach and then the average value per acre. The report then pointed out that it would take 50 years for the acre at the complex to erode, which meant that only 870 square feet would be lost each year. Accordingly, the report determined the recreational value of 870 square feet that would be lost per year and the cumulative recreational value that would be lost over 50 years. The result was $5.3 million in recreational value. The report further explained, however, that such a fee would have to be discounted to present value if it were paid in one lump sum instead of installments over 50 years.[3]

---

[2] Among the studies and guides that were cited in the report and/or submitted in support of it and included in the administrative record are: 5 Leeworthy et al. (1990) A Socioeconomic Profile of Recreationists at Public Outdoor Recreation Sites in Coastal Areas: Leeworthy et al. (1990) Expenditure Profiles of Visitors to Southern California Coastal Areas; 6 Leeworthy et al. (1991) A Socioeconomic Profile of Recreationists at Public Outdoor Recreation Sites in Coastal Areas: Arrow, et al. (1993) Report of the NOAA (National Oceanic and Atmospheric Administration) Panel on Contingent Valuation; Leeworthy and Wiley (1993) Recreational Use Value for Three Southern California Beaches (hereafter Leeworthy and Wiley (1993)); King and Potepan (1997) The Economic Value of California Beaches; Ulibarri and Wellman (1997) Natural Resource Valuation: A Primer on Concepts and Techniques; King (1999) The Fiscal Impact of Beaches in California; EPA Guidelines for Preparing Economic Analyses (hereafter, EPA Guidelines); Chapman and Hanemann (2000) Environmental Damages in Court: The *American Trader* Case (hereafter, *American Trader* study); Pendleton (2004) Harnessing Ocean Observing Technologies to Improve Beach Management: Examining the Potential Economic Benefits of an Improvement in the Southern California Coastal Ocean Observing System; King (2003) The Potential Loss in Gross National Product and Gross State Product from a Failure to Maintain California Beaches <http://userwww.sfsu.edu/~pgking/pubpol.htm> (as of May 23, 2008); National Oceanic and Atmospheric Administration (1995) Economic Valuation of Natural Resources; National Oceanic and Atmospheric Administration, Beach Nourishment: A Guide for Local Government Officials; King, Economic Analysis of Beach Spending and the Recreational Benefits of Beaches in the City of San Clemente; Ecosystem Valuation, Dollar-based Ecosystem Valuation Methods <http://www.ecosystemvaluation.org> (as of May 23, 2008).

[3] The calculations in the report are as follows: 968,287 annual visitors divided by 60.6 acres of beach equals 15,978 visitors per acre; 15,978 annual visitors times a recreational value of $13 per person equals an annual recreational value of $207,714 per acre. The yearly amount of erosion—870 square feet—represents 1.9972 percent of an acre. That percentage of the total annual recreational value of an acre ($207,714) equals $4,148.

Thus, $4,148 in recreational value would be lost the first year; in the second year, the loss would be the original $4,148 plus another $4,148 for the next 870 square feet lost; and, "[e]ach

The report opined that the recreational value method was "attractive because it is based on an analysis of actual beach recreational values in the vicinity of the project." However, this method also "requires assumptions" about the economic value that beach goers place on the beach. Nonetheless, the report opined that its calculation "is likely conservative (underestimates) because it does not account for the value of non-quantifiable benefits of the recreational beach resource. Nor does it include other benefits such as potential habitat and aesthetic values."

The report ultimately recommended a $1 million mitigation fee based on the land replacement method, finding it "closely tied to specific land values in the vicinity of the . . . seawall on public recreational beach land." However, the report opined that "this fee must be considered only partial mitigation for the impacts of the proposed project, since no measure can prevent the loss of the existing recreational beach currently fronting [the complex]." It further opined that analysis under the economic valuation methods suggested that the recommended fee was conservative and underestimated the loss due to the seawall.

The Commission report was circulated to interested parties, and before the hearing, Homeowners submitted a written response through its attorney, David Larsen. He claimed that the fee was an unconstitutional taking because there was no nexus or rough proportionality between the fee and the impact of the seawall. He asserted that, under the Act, Homeowners was entitled to a seawall to protect existing structures as long as it mitigated land loss. He noted that Homeowners had suggested a comprehensive regional approach to sand loss and nourishment along the entire coast, but the staff report recommended a mitigation fee instead. Thus, he argued that the fee was invalid because it disproportionately concentrated responsibility for the natural process of beach erosion on Homeowners.

At a hearing on October 14, 2004, Homeowners urged the Commission to use the $1 million mitigation fee to fund a geological hazard abatement district to study and develop a comprehensive regional erosion program rather than to buy coastal property elsewhere, which, it argued, would neither protect nor restore the beach at the complex.

After further public comment, all but one commissioner agreed to require a mitigation fee. However, two amendments were offered. One proposed using the fee for a regional erosion plan as urged by Homeowners, but that proposal was defeated. Commissioner Nava proposed adopting the $5.3 million mitigation fee calculated under the economic recreational value method. He asserted

---

successive year would add another $4,148 to the total from the previous year's total because the project will need to mitigate for the cumulative beach loss over time."

that the Commission had been underestimating the value of public land and opined that "what you have in this situation, is a private taking of public land, for the benefit of the private landowners, because that is what the law says they are entitled to do, as it relates to armoring of the shoreline, so that the structure is protected." Citing information in the staff report, he argued that the fee should be based on the value of the lost recreational benefits, which, he noted, was greater than the $1 million estimated under the land value method.

The district director of the Commission reminded the commissioners that the $5.3 million represented the *cumulative* loss of recreational value over 50 years and the net amount of the fee would depend on how it was paid. When one commissioner inquired about a lump-sum payment or amortization, Commissioner Nava responded that he simply proposed adopting the fee as calculated in the report, and staff could work out the details of payment.

Before the Commission voted, Mr. Larsen urged the Commission to reconsider the geological hazard abatement district because it could provide a funding mechanism to raise many more millions of dollars for a comprehensive shoreline protection plan. He also reiterated his claim that a fee to purchase property was unconstitutional.

Thereafter, the Commission voted to adopt the Nava amendment.

Later, in November 2004, staff revised the report in accordance with the Commission's decision. The new report proposed a finding that the economic recreational value method "is the *most* attractive method because it is based on an analysis of the actual beach recreational values in the vicinity of the project. *This method is a more accurate reflection of what the state is actually losing as a result of this project.*"[4] (Italics added.) The revised report further explained that the fee would be paid in five yearly installments, and the actual amount paid would be $2,150,054, or $430,011 per year for five years, which, using a 3 percent discount rate, represented the present value of 50 yearly installments that would eventually total $5.3 million. The revised report was then recirculated.

A hearing was held on December 9, 2004, to determine whether to adopt the revised findings. At that time, the commissioners questioned whether they had authorized staff to discount the $5.3 million fee to present value and continued the hearing to review a transcript of the previous hearing.

---

[4] We italicize changes that staff made to the original report. Otherwise, the revised finding reiterated all of the information in the original report verbatim.

At the continued hearing on January 13, 2005, Homeowners challenged the discount rate used by staff as too low and complained that the Commission had improperly delegated authority to determine how the fee would be paid.

Mr. Larsen sought to raise some new issues that had come up after the October hearing.[5] However, staff counsel advised Mr. Larsen that the only question before the Commission was "whether the revised findings reflect the action of the Commission," which would include discussion about the implementation of the mitigation fee. (See Cal. Code Regs., tit. 14, § 13096, subd. (c).)[6] When Mr. Larsen asked if he could submit a letter, counsel advised him that he could not now raise claims that could and should have been made in October before the Commission took action to impose the fee.

The commissioners then discussed whether the revised findings reflected the action they had taken in October and, finding that they did, adopted them.

### JUDICIAL PROCEEDINGS

In its petition for a writ of administrative mandate, Homeowners challenged the Commission's finding concerning the loss of recreational use and lateral access, pointing to a lack of evidence that anyone used the beach at the

---

[5] For example, in a letter after the October hearing, Mr. Larsen complained of "irregularities" during the hearing. Among other things, he asserted that neither Commissioner Nava nor the staff had made an individualized determination that the amount of the fee was warranted or appropriate. In this regard, he noted that Commissioner Nava and the staff report had made references to Huntington Beach, but no effort had been made to compare or contrast it with the Monterey beach. Indeed, he noted that the staff initially had not recommended use of the economic recreational value method, and staff had acknowledged that there had not been any studies to support the assumptions underlying the calculation of a $5.3 million fee and therefore that the calculation was based on what was " 'probably a reasonable estimate' " of expenditures. Mr. Larsen also noted a lack of evidence to show that the same number of people use the Del Monte beach as other beaches in the area. In short, he claimed that the lack of an individualized determination was a significant flaw because the amount of the fee calculated under the economic method could vary widely depending on data concerning per person expenditures and number of annual visitors. Accordingly, he claimed the fee was both unjustified and not supported by substantial evidence.

[6] California Code of Regulations, title 14, section 13096, subdivision (a) provides: "All decisions of the commission relating to permit applications shall be accompanied by written conclusions about the consistency of the application with [the Public Resources Code] and findings of fact and reasoning supporting the decision."

The regulations recognize that decisions of the commission will sometimes be "different than those proposed by the staff in the staff recommendation . . . ." (Cal. Code Regs., tit. 14, § 13090, subd. (d).) When that occurs, the prevailing commissioners must "state the basis for their action in sufficient detail to allow staff to prepare a revised report with proposed revised findings that reflect the action of the commission." (*Id.,* § 13096, subd. (b).) The commissioners must then approve the revised findings at a public hearing. "The public hearing shall solely address whether the proposed revised findings reflect the action of the commission." (*Id.,* § 13096, subd. (c).)

complex and to its agreement to provide alternative access. Homeowners also challenged the $5.3 million fee because it was not based on a specific study of the Monterey beach, and there was no evidence to support a recreational value of $13 per person.

Homeowners also claimed that the fee was an unconstitutional taking because there was no nexus or rough proportionality between the fee and the impact of the seawall. They noted that the fee would be used to buy land elsewhere and could ultimately be used to develop alternative recreational opportunities.

Last, Homeowners claimed that the fee was arbitrary and based on post hoc rationalization because the Commission first decided to increase the fee from $1 million to $5 million and then sought a justification for doing so.

The trial court denied the petition. It found that Homeowners had failed to exhaust its administrative remedies and thus preserve for judicial review its claims concerning (1) the alleged loss of public access and recreational use, (2) the method of calculating the amount of the fee, (3) authorization for a fee under the Act and (4) the sufficiency of alternative lateral access, because it had not raised those claims before or at the October 2004 hearing at which the Commission decided to require the fee. (*Styne v. Stevens* (2001) 26 Cal.4th 42, 56 [109 Cal.Rptr.2d 14, 26 P.3d 343] [exhaustion of administrative remedy a prerequisite for judicial review]; *Ralph's Chrysler-Plymouth v. New Car Dealers Policy & Appeals Bd.* (1973) 8 Cal.3d 792, 794 [106 Cal.Rptr. 169, 505 P.2d 1009] [same]; see, e.g., *McAllister v. County of Monterey* (2007) 147 Cal.App.4th 253, 287–288 [54 Cal.Rptr.3d 116].)

The court concluded that the mitigation fee was constitutional, finding the requisite nexus and rough proportionality between the fee and the impact of the seawall. The court further found that the Act did not limit what kind of mitigation the Commission could require. Finally, the court rejected Homeowners' "post-hoc rationalization" claim, finding that the Nava amendment to increase the fee was based on the previous analysis and determination in the staff report concerning the recreational value of an acre of beach.

STANDARD OF REVIEW ON APPEAL

Section 30801 gives anyone who appears at a public hearing or informs the Commission of concerns the right to judicial review of a decision by filing a petition for writ of mandate pursuant to Code of Civil Procedure section 1094.5. (*La Costa Beach Homeowners' Assn. v. California Coastal Com.* (2002) 101 Cal.App.4th 804, 814 [124 Cal.Rptr.2d 618].) " 'The inquiry in such a case shall extend to the questions of whether the [Commission] has

proceeded without, or in excess of jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion.' " (*Ibid.*) An abuse of discretion is established if the Commission failed to proceed in the manner required by law, its order or decision is not supported by the findings, or its findings are not supported by substantial evidence. (*Ibid.*; *Eden Hosp. Dist. v. Belshe* (1998) 65 Cal.App.4th 908, 915–916 [76 Cal.Rptr.2d 857]; § 30801; Code Civ. Proc., § 1094.5, subd. (b).)

The trial court presumes that the agency's decision is supported by substantial evidence, and the party challenging that decision bears the burden of demonstrating the contrary. (*Desmond v. County of Contra Costa* (1993) 21 Cal.App.4th 330, 336 [25 Cal.Rptr.2d 842]; *Saad v. City of Berkeley* (1994) 24 Cal.App.4th 1206, 1212 [30 Cal.Rptr.2d 95].) In reviewing the agency's decision, the court examines the whole record and considers all relevant evidence, including that evidence which detracts from its decision. (*Bolsa Chica Land Trust v. Superior Court* (1999) 71 Cal.App.4th 493, 503 [83 Cal.Rptr.2d 850].) "Although this task involves some weighing to fairly estimate the worth of the evidence, that limited weighing does not constitute independent review where the court substitutes its own findings and infer-ences for that of the Commission. Rather, it is for the Commission to weigh the preponderance of conflicting evidence, as [the court] may reverse its decision only if, based on the evidence before it, a reasonable person could not have reached the conclusion reached by it." (*Kirkorowicz v. California Coastal Com.* (2000) 83 Cal.App.4th 980, 986 [100 Cal.Rptr.2d 124]; see *Sierra Club v. California Coastal Com.* (1993) 12 Cal.App.4th 602, 610 [15 Cal.Rptr.2d 779].)

On appeal from the denial of a petition, our role is identical to that of the trial court. (*Bolsa Chica Land Trust v. Superior Court, supra,* 71 Cal.App.4th at p. 503; *Saad v. City of Berkeley, supra,* 24 Cal.App.4th at p. 1212; *Sierra Club v. California Coastal Com., supra,* 12 Cal.App.4th at p. 610; *Barrie v. California Coastal Com.* (1987) 196 Cal.App.3d 8, 14 [241 Cal.Rptr. 477].)

### CONSTITUTIONALITY OF THE MITIGATION FEE

Homeowners reiterates its claim that the mitigation fee is unconstitutional because there is neither a nexus nor rough proportionality between it and the impacts of the seawall.

### *The Nexus and Rough Proportionality Requirements*

"The state and federal Constitutions prohibit government from taking private property for public use without just compensation." (*Kavanau v. Santa Monica Rent Control Bd.* (1997) 16 Cal.4th 761, 773 [66 Cal.Rptr.2d 672,

941 P.2d 851]; see Cal. Const., art. I, § 19; U.S. Const., 5th Amend; *Chicago, Burlington &c. R'D v. Chicago* (1897) 166 U.S. 226, 239 [41 L.Ed. 979, 17 S.Ct. 581] [applying the federal takings clause to the states].) A land use regulation constitutes a taking that requires compensation if it " 'does not substantially advance legitimate state interests or denies an owner economically viable use of his land.' " (*Lucas v. South Carolina Coastal Council* (1992) 505 U.S. 1003, 1016 [120 L.Ed.2d 798, 112 S.Ct. 2886], quoting *Agins v. Tiburon* (1980) 447 U.S. 255, 260 [65 L.Ed.2d 106, 100 S.Ct. 2138], italics omitted.)

In *Nollan v. California Coastal Comm'n* (1987) 483 U.S. 825 [97 L.Ed.2d 677, 107 S.Ct. 3141] (*Nollan*), the United States Supreme Court explained what sort of connection satisfies the requirement that a permit substantially advance a state interest. (*Id.* at pp. 835, 837.) There, the Commission allowed the Nollans to replace a small beachfront bungalow but required that they grant a public easement across their property on the beach because the new larger house would interfere with visual access and create a psychological barrier to using the beach. (*Id.* at pp. 828, 838.)

The court explained that the power to impose a permit condition derived from the power to deny a permit. Thus, "a permit condition that serves the same legitimate police-power as a refusal to issue the permit should not be found to be a taking if the refusal to issue the permit would not constitute a taking." (*Nollan, supra,* 483 U.S. at p. 836.) Assuming that the permit could have been denied to protect visual access and overcome psychological barriers, the court opined that the Commission could impose permit conditions that served those same purposes. (*Id.* at pp. 835–836.) However, the court overturned the easement condition because requiring the Nollans to provide access to people already on the beach did nothing to promote visual access to the beach or overcome psychological barriers to its use. (*Id.* at p. 838.) Thus, because the required easement lacked a "nexus"—i.e., a logical link—to the alleged impact, the condition caused an unconstitutional taking. (*Id.* at p. 837; see also, e.g., *Surfside Colony, Ltd. v. California Coastal Com.* (1991) 226 Cal.App.3d 1260 [277 Cal.Rptr. 371] [absent evidence that project would cause erosion, no nexus between it and a permit condition requiring lateral beach access].)

In *Dolan v. City of Tigard* (1994) 512 U.S. 374 [129 L.Ed.2d 304, 114 S.Ct. 2309] (*Dolan*), the court held that in addition to having a nexus with projected impacts, a permit condition must also be sufficiently connected in nature and extent. (*Id.* at pp. 386, 388.)

There, the city allowed Dolan to expand her store and pave a gravel parking lot. But because part of her property was in the flood plain, the city

required her to dedicate that part for a *public* greenway to mitigate a projected increase in drainage. It also required her to dedicate property next to the greenway for a pedestrian and bicycle pathway to mitigate a projected increase in traffic to the store. (*Dolan, supra*, 512 U.S. at pp. 379–381.) The court found a nexus between a dedication of land and the need for additional drainage and a dedication for a path and the need to reduce vehicular traffic. (*Id.* at pp. 387–388.) The court then focused on whether the city's finding that the dedications were "reasonably related" to projected impacts established a sufficient connection between the extent of the projected impacts and required dedications. (*Id.* at pp. 388–389.)

To establish the applicable standard for the sufficiency of a connection, the court turned to state court decisions. Some states considered "very generalized statements as to the necessary connection between the required dedication and the proposed development" to be sufficient. (*Dolan, supra*, 512 U.S. at p. 389.) The court rejected that approach because it was "too lax" to protect the constitutional right to just compensation. (*Ibid.*) A few other states required "a very exacting correspondence, described as the 'specifi[c] and uniquely attributable' test," under which "if the local government cannot demonstrate that its exaction is directly proportional to the specifically created need, the exaction becomes 'a veiled exercise of the power of eminent domain and a confiscation of private property behind the defense of police regulations.' [Citations.]" (*Id.* at pp. 389–390.) The court rejected that approach, finding that the federal Constitution did not require such "exacting scrutiny, given the nature of the interests involved." (512 U.S. at p. 390.)

The court ultimately adopted an intermediate approach favored by most states and held that there must be "rough proportionality" between a condition and the extent of the impact it is supposed to mitigate. (*Dolan, supra*, 512 U.S. at pp. 390–391.) The court explained, "No precise mathematical calculation is required, but the city must make some sort of *individualized determination* that the required dedication is related *both in nature and extent* to the impact of the proposed development." (*Id.* at p. 391, fn. omitted, italics added.)

Turning to the facts, the court observed that if the dedication of property in the flood plain was designed to facilitate drainage, that purpose could as readily be served by simply prohibiting further development. Thus, a *public* dedication of land went beyond what was necessary. Because the city had failed to make findings sufficient to justify it, the required dedication lacked rough proportionality with the impact it was designed to mitigate. (*Dolan, supra*, 512 U.S. at pp. 393–394.) In contrast, the court opined that if Dolan's project were to encroach on the existing public greenway space, "it would have been reasonable to require [her] to provide some alternative greenway space for the public either on her property or elsewhere." (*Id.* at p. 394.)

The court also found that the dedication for a path was not roughly proportional to the impact on traffic because the city had not demonstrated a sufficient relationship between the number of additional vehicle trips the new store would generate and requiring land for a path. Rather, the city had simply found that a pathway " '*could* offset some of the traffic demand . . . and lessen the increase in traffic congestion,' " which, the court found, was "a far cry from a finding that the bicycle pathway system *will,* or is *likely to,* offset some of the traffic demand.' [Citation.]" (*Dolan, supra,* 512 U.S. at p. 395, italics in *Dolan.*) The court explained, "No precise mathematical calculation is required, but the city must make some effort to quantify its findings in support of the dedication for the pedestrian/bicycle pathway beyond the conclusory statement that it could offset some of the traffic demand generated." (*Id.* at pp. 395–396.)

*The* Nollan-Dolan *Test and In-lieu Mitigation Fees*

■ Both *Nollan* and *Dolan* involved permit conditions that required the dedication of land or an interest in land. However, the *Nollan-Dolan* test is not limited to such conditions. In *Ehrlich v. City of Culver City* (1996) 12 Cal.4th 854 [50 Cal.Rptr.2d 242, 911 P.2d 429] (*Ehrlich*), the California Supreme Court held that the test also applied to ad hoc mitigation fees. (*Id.* at pp. 875–876, 881 (plur. opn. of Arabian, J.); accord, *San Remo Hotel v. City and County of San Francisco* (2002) 27 Cal.4th 643, 666–667 [117 Cal.Rptr.2d 269, 41 P.3d 87].) *Ehrlich* is particularly instructive here.

There, the owner of a private recreational facility, whose parcel was restrictively zoned for commercial recreational use, sought a zoning change to build condominiums. The city agreed to rezone the property but required an in-lieu fee of $280,000 for the development of new recreational facilities elsewhere. (*Ehrlich, supra,* 12 Cal.4th at p. 862.) The court found the requisite nexus between the loss of recreational facilities and the imposition of an in-lieu mitigation fee to develop new ones. (*Id.* at pp. 881–882 (plur. opn. of Arabian, J.).) However, the court concluded that the amount of the fee was not roughly proportional to the impact of the zoning change.

The court noted the lack of "individualized findings" to establish a connection between the amount of the fee and the loss of the restrictive zoning on the parcel. The city argued that the fee was partial compensation for the loss of $800,000 in recreational improvements on the property. However, the court pointed out that the impact to be mitigated was the loss of the restrictive zoning not the loss of recreational improvements on the property. (*Ehrlich, supra,* 12 Cal.4th at p. 883 (plur. opn. of Arabian, J.).) The city also asserted that if it had denied the zoning change, four new private tennis courts would have been built. Thus, the zoning change resulted in the

loss of four new courts, and the fee represented the cost of building them. The court again found the amount of the fee unjustified because the cost of private courts would have been paid by the members of the private club, and the general public would not have had access to them. "Thus, under the city's formula, the public would receive, ex gratia, $280,000 worth of recreational facilities the cost of which it would otherwise have to finance through membership fees. [The owner] is being asked to pay for something that should be paid for either by the public as a whole, or by a private entrepreneur in business for a profit. The city may not constitutionally measure the magnitude of its loss, or of the recreational exaction, by the value of facilities it had no right to appropriate without payment." (*Ibid.* (plur. opn. of Arabian, J.).)

The court opined, however, that the city could impose a fee that was "tied more closely to the actual impact of the land-use change the city granted plaintiff," such as a fee to help defray the administrative cost of rezoning other property for commercial recreational use, or a fee to mitigate a decrease in the city's ability to attract private recreational development and defray the costs of inducing such development. (*Ehrlich, supra,* 12 Cal.4th at p. 884 (plur. opn. of Arabian, J.).) In addition, although the city could not have required the owner to dedicate the same amount of land for *public* recreational facilities, it could require the owner to transfer the former zoning designation to a comparable property that the owner had, which could then induce the development of another private recreational facility at that site. And if such a transfer were impractical, then the city could "surely levy an in-lieu exaction to accomplish the same objective. Such a fee would serve the same purpose as do all development fees: providing the city with a means of escaping the narrow choice between denying plaintiff his project permit altogether or subordinating legitimate public interests to plaintiff's development plans." (*Ibid.* (plur. opn. of Arabian, J.).)

*The Nexus Between the Seawall and the Mitigation Fee*

We first determine whether there is a nexus between the projected impact of the seawall and the mitigation fee.

■ It is beyond dispute that California has a legitimate interest in protecting and maintaining its beaches as recreational resources. That interest is embodied in the Act, which declares as one of its goals the need to "maximize public recreational opportunities in the coastal zone . . . ." (§ 30001.5, subd. (c); see *La Costa Beach Homeowners' Assn. v. California Coastal Com., supra,* 101 Cal.App.4th at p. 815.) Thus, the Act requires that every coastal development permit include a specific finding that it conforms to "public recreational policies" set forth elsewhere in the Act. (See §§ 30604,

subd. (c), 30210 [requiring that "recreational opportunities" be provided], 30213 [requiring that "recreational facilities" be "protected, encouraged, and, where feasible, provided"], 30220 [requiring the protection of coastal areas suited for "recreational activities" not available inland], 30221 [requiring the protection of oceanfront land "suitable for recreational use" for present and foreseeable future demand for such activities].)

Next, we note that both the City's EIR and the Commission's report and ultimate findings explained that the seawall would cause passive erosion that would eventually eliminate an acre of beach in front of the complex. Both reports opined that the resulting loss of continuous lateral access could be mitigated by alternative access through the complex's parking lot. However, the loss of beach and its recreational use were unavoidable impacts, and there was no feasible way to directly mitigate them.

Although the City considered the loss of recreational use an insignificant impact, the Commission, in accordance with its mandate under the Act to maximize, maintain, and protect recreational use, concluded that the loss required mitigation. Since the erosion of beach was inevitable and unavoidable, the Commission imposed an in-lieu mitigation fee to develop substitute recreational opportunities elsewhere. Clearly, there is a nexus—i.e., a logical connection—between the purpose of the mitigation fee and the loss of a recreational resource due to the seawall. (Cf. *Ehrlich, supra*, 12 Cal.4th at pp. 881–882 (plur. opn. of Arabian, J.) [finding a nexus between the loss of recreational facilities and the imposition of an in-lieu mitigation fee to help develop recreational facilities elsewhere].)

Homeowners asserts that *Nollan* forbids an in-lieu mitigation fee that is not tailored to the direct, onsite impacts of the proposed project, which here they identify as only the loss of beach and continuous lateral access and a decrease in the sand supply. They note that according to both the EIR and the staff report, there is no feasible way to save the beach, mitigate the loss of sand, or create new beach near the complex. Thus, they argue that purchasing beach property somewhere else has no tendency to mitigate the loss of beach at the complex. They also argue that because the economic recreational value method is based on expenditures by beachgoers, the resulting fee mitigates the economic losses to local businesses and not the loss of recreational use. In all, therefore, Homeowners claims that the mitigation fee has no more nexus with the impacts of the seawall than the required easement condition in *Nollan*. We disagree.

First, Homeowners's view of the impacts of the seawall fails to recognize the loss of recreational use as a distinct impact. *Nollan* did not involve such an impact. Moreover, the causal connection between the seawall and loss of

recreational use is as direct and specific as the connection between the Nollans' new house and its impact on the view of the beach. Furthermore, in *Nollan*, requiring an easement on the beach did not logically address the project's impacts on *visual* access and its psychological barrier to using the beach. Here, however, a fee to purchase another beach for public recreation has a logical tendency to mitigate loss of recreational use on the beach at the complex. Finally, *Nollan* does not suggest that, where a project has an unavoidable onsite impact that cannot be directly mitigated, the Commission may not require equivalent offsite mitigation. On the contrary, in *Dolan*, the court opined that if Dolan's expanded store encroached on the flood plain, making it impossible to require her to keep the greenway area open and clear, the city could have required her to provide land someplace else for the greenway. (*Dolan, supra*, 512 U.S. at p. 394.) Similarly, in *Ehrlich*, the court opined that to mitigate the loss of a parcel restrictively zoned for recreational facilities, the city could have required Ehrlich to transfer that restrictive zoning designation to a different parcel *or* pay an in-lieu fee to help the city develop recreational facilities elsewhere. (*Ehrlich, supra*, 12 Cal.4th at p. 884 (plur. opn. of Arabian, J.); see also *La Costa Beach Homeowners' Assn. v. California Coastal Com., supra*, 101 Cal.App.4th 804 [upholding dedication of offsite property to mitigate onsite impact on view corridor].)

Last, we reject Homeowners's claim that the fee lacks a nexus because it was based on expenditures wholly unrelated to the loss of local sand supply. As long as the economic recreational value method used to calculate the fee represents a valid way to quantify recreational value, the fact that it relies in part on expenditures does not ipso facto preclude there from being a nexus between fee and impact. Indeed, as we shall discuss more fully below, because recreational use is not a commodity with a market price to reflect its value, certain types of expenditures must be used as a proxy in determining recreational value.

*Rough Proportionality Between the Seawall and the Mitigation Fee*

We now focus on whether the mitigation fee is roughly proportional to the extent of the loss of an acre of beach and recreational use.

The Commission's computations (see fn. 3, *ante*) are beyond dispute: If it properly applied the method and the figures used were valid, then the

mathematical result is correct. However, to determine whether the computation produced a fee that is roughly proportional to loss of recreational use, we must look behind the arithmetic and evaluate how the Commission analyzed the loss and measured it.[7]

To understand the Commission's analysis, we consider it helpful to summarize the economic recreational value method as explained in voluminous material that guided the Commission. (See fn. 2, *ante*.)

In addition to its value as a piece of real estate, a beach can be valued in two other ways: by its economic impact and by its intrinsic economic value as a recreational resource. The economic impact of a beach reflects the contribution that a beach makes to the economy in the form of income for businesses and employees and the related tax revenues for government. Basically, economic impact is determined by the number of beach visitors and the average amount each spends for *all* beach-related activity, including transportation, parking, food, recreational equipment, tours, restaurants, hotels, camping, etc. Knowing the economic impact is useful because it helps quantify the economic consequences to business and government from the loss of a beach due to storms, erosion, and pollution, and such information can then help guide decisions concerning how much to spend on beach protection, maintenance, and improvements, and whether to lobby for state and federal assistance commensurate with the level of tax revenues generated by the beach. (See King & Potepan, *supra*, The Economic Value of California Beaches, pp. 3088–3090; King, *supra*, The Fiscal Impact of Beaches in California, pp. 3268–3296.)

Economic impact, however, does not measure recreational value. Generally, the recreational value of a beach is viewed as the difference between what a person is willing to pay to enjoy it and how much it actually costs to do so. This difference is called the consumer surplus, and it can be estimated using the travel-cost method the Commission staff cited in the revised report.

Basically, the travel-cost method uses the average per person cost of getting to the beach—i.e., average expenditures for tolls, mileage, gas,

---

[7] We acknowledge some tension between the nature of our inquiry and the trial court's ruling that Homeowners had failed to exhaust its administrative remedies concerning the method of calculating the fee. However, Homeowners did not forfeit its general claim that the fee lacks both a nexus and rough proportionality with the impacts of the seawall. And in our view, we cannot determine whether the $5.3 million fee is roughly proportional to the impact of the seawall unless we evaluate both the nature of the impact and the way its dollar value was measured. Nor can we determine whether the amount of the fee is supported by the Commission's findings and conclusions concerning the extent, nature, and dollar value of the loss, and whether those findings are supported by substantial evidence, unless we examine how the Commission analyzed recreational use and calculated its value.

parking, repairs—as a proxy for an admission price. As such, the average cost reflects at a minimum what a person is willing to pay to enjoy the beach and how much it costs to do so, that is, the consumer surplus of the beach. Thus, the total consumer value of a beach or its recreational value is determined by the number of beach visitors and the average cost per person of getting there. (See Leeworthy & Wiley, *supra*, pp. 2998–3006; Ulibarri & Wellman, *supra*, Natural Resource Valuation: A Primer on Concepts and Techniques, pp. 3138–3148.)

The travel-cost method and economic impact analysis are similar, in that both are based on expenditures and the number of visitors. However, they are fundamentally different. The former uses only the costs of getting to the beach and measures recreational value; the latter uses all beach-related expenditures and measures the benefit to the economy. With this distinction in mind, we turn to the Commission's analysis.

The revised report cited studies showing that California beaches contribute billions of dollars to the economy in terms of expenditures for everything from hot dogs to hotels. The report further noted that beaches also have intrinsic recreational value or consumer surplus, which is commonly determined under the travel-cost method, which focuses on average transportation costs. The report stated that to set an adequate mitigation fee, "it is necessary to determine general beach attendance in the area as well as an average daily beach expenditure/non-market consumer surplus value per person. An important piece of beach valuation method is the identification of consumer expenditures related to beach recreation." The report then noted that although there are no studies of "beach expenditures" in the Monterey Bay area, a 1999 study of five beaches in the Huntington Beach area found a range of daily, per person beach-related expenditures depending on the particular beach from around $6 to $23, or an average expenditure of $13 per person. That study, which is part of the record, focused on the *economic impact* of those beaches on tax revenues and its conclusions are based on expenditures for everything from transportation to lodging.

Although this passage suggests that the Commission may have considered all beach-related expenditures, which would be relevant only in determining economic *impact*, the remainder of the report dispels that suggestion and reveals a proper focus on recreational value and consumer surplus.

The report observed, "In other studies, non-market consumer surplus estimates range from a low of $10.98 (in 2001 dollars) for visits to Cabrillo Beach in Los Angeles County to a high of greater than $70.00 (in 2001 dollars) per person per trip for visits to San Diego beaches." This information comes almost verbatim from a draft of a study on the potential economic

benefits of improving the oceanic observational technology in Southern California. That study cited the sources of the consumer surplus figures for the Cabrillo and San Diego beaches, and the Cabrillo source—Leeworthy and Wiley (1993)—is included in the administrative record and confirms the consumer surplus information.

The revised report next cited a lengthy study of litigation concerning an oil tanker spill off Huntington Beach, in which the jury awarded damages for the temporary loss of recreational use based, in part, on an estimate of consumer surplus of around $13 per person per visit. The record also includes the study of the oil spill case—American Trader study—which confirms the information concerning the average consumer surplus of the affected beaches.

The report acknowledged that "[w]ith respect to economic value of Monterey's beaches, there have been no specific economic studies done regarding the per-person beach expenditures in the Monterey area." However, the report opined that the $13 per person per visit "is probably a reasonable estimate for the consumer surplus of the beaches in the Monterey area." The report pointed out that the consumer surplus for the Huntington Beach area would be $1 or $2 higher today due to inflation. The report recognized that the Monterey beach is not as highly developed as those near Huntington Beach but noted various qualities—equipment rentals, beach hotels, shops, restaurants; the wide, sandy quality of the beaches; and their location in a popular, urbanized area on the Central Coast—that nevertheless made it desirable and warranted an equivalent consumer surplus. Moreover, the report noted that more recent research suggests that the consumer surplus of Southern California beaches is somewhat lower. Thus, the report ultimately found that a $13 per person consumer surplus "is a reasonable and conservative estimate for the Monterey area."

In support of this finding, the report noted a staff communication with Professor Linwood Pendelton, who authored one of the studies cited in the report. The record contains an e-mail from Charles Lester, the Commission's district director, to Professor Pendleton concerning the value of lost recreational use on an acre of beach in which he asked whether there was a better estimate of per person consumer surplus than $13 and whether the approach in the report was defensible.

Professor Pendelton replied that the method was defensible. Concerning the $13 figure, he stated, "We still do not have a definitive value/person in Southern California. First, the value per beach day is probably going to be greater for Monterey beach goers (than SoCal beach goers) because they make fewer trips due to a shorter season. Second, there are fewer substitutes in Monterey Bay (so that also pushes the price up). Third, I think the summer

time value per beach day (per person) in SOCAL is going to be between $7 and $10. In other words, your figure of $13 is going to be very close and defensible given the best available data."

As noted, *Dolan* required the Commission to make an individualized determination that the fee is related to the impact of the seawall in nature and extent. Moreover, that determination could not be based on general and conclusory findings that the fee is reasonably related to the impact; rather, the Commission had to make "some effort to quantify" the relationship between fee and impact. (*Dolan, supra*, 512 U.S. at p. 395.)

Here, the Commission went far beyond the determinations found inadequate in *Dolan* and *Ehrlich*. Although neither case provides examples of what would satisfy the "rough proportionality" standard, we have no difficulty concluding the Commission's determination did and that the amount of the fee is roughly proportional to loss of recreational use. Indeed, although the Commission was not required to make a precise mathematical calculation, show an exacting correspondence between the fee and the loss of recreational value, or demonstrate that the fee was directly proportional to the loss (*Dolan, supra*, 512 U.S. at pp. 389–391), that is what it did.

Homeowners again asserts that because the fee is based on expenditures, it represents the projected economic losses to local businesses and the tourist industry rather than the impact on the local shoreline sand supply. It claims that just as it was error in *Ehrlich* to measure the impact of a zoning change by the cost of new tennis courts, here it was error to measure the impact on the sand supply by the loss of beach-related expenditures. Thus, it argues that the fee cannot possibly be roughly proportional to the impact of the seawall.

Again, Homeowners fails to consider the loss of recreational use as a direct impact of the seawall and thus a proper focus of separate mitigation. Moreover, the economic studies establish the travel-cost method as a valid and accepted way to quantify recreational value and thus put a dollar value on the loss of recreational use. Although it would have been incorrect to measure that loss by the economic *impact* of an acre of beach, the Commission's analysis properly focused on the economic recreational value and relied on pertinent data concerning consumer surplus.

■ In sum, we find both a proper nexus and rough proportionality between the mitigation fee and the impact of the seawall on recreational use. Thus, we reject Homeowners's claim that the fee is an unconstitutional taking.

SUFFICIENCY OF THE EVIDENCE

Homeowners claims that the amount of the fee is not supported by substantial evidence in that (1) it was not based on a study of the recreational value of the Monterey beach; (2) the use of data concerning consumer surplus elsewhere, specifically the $13 per person surplus at Huntington Beach, to calculate the recreational value was arbitrary and unreasonable because the climate and temperature at Southern California beaches are more conducive to beach recreation and the public accommodations are more developed there than they are at the Monterey beach; and (3) there was no evidence that the public even uses the acre of beach at the complex for recreation.

First, the lack of a specific study of the beach in Monterey and the Commission's reliance on studies of other California beaches do not establish that the mitigation fee lacks sufficient evidentiary support. The Commission acknowledged the lack of a Monterey study; and in relying on other studies, the Commission adopted an analytical approach called benefit transfer, which was outlined in the EPA Guidelines at pages 86–87 and applied by the state in the American Trader oil spill litigation to estimate the recreational value of the beaches that were despoiled. (American Trader study, *supra*, at pp. 3, 5–6, 11–12.) As explained in the EPA Guidelines, original economic studies are expensive and time consuming. The benefit-transfer approach can reduce both the time and cost of determining the value of nonmarket benefits such as recreational use. (EPA Guidelines, *supra*, at p. 86.) Under this method, the literature is surveyed for pertinent studies—called study cases—and their information is evaluated for equivalence, quality, and relevance. Differences and variables between the study case and the new case—called the policy case—are analyzed to determine whether it is reasonable and appropriate to apply data to the policy case, and if so whether to do so with or without informed adjustments. (*Id.* at pp. 86–87.)

For example, in the American Trader oil spill litigation, rather than conduct an original travel-cost study of consumer surplus of the affected beaches, the state collected studies of the consumer surplus of other beaches in California, New England, and Florida. (American Trader study, *supra*, at pp. 11–12.) The state rejected studies of New England beaches because of economic and social differences in the recreational use of beaches and the quality, location, and cost of getting there. (*Id.* at p. 11.) The state also rejected the California studies because of a flaw in the method that was used to estimate the number of visitors or beach trips, a key factor in estimating consumer surplus. However, the state used the Florida study because it found that beach recreation plays similar roles in Florida and California and the demographics of beachgoers were sufficiently similar to make the consumer surplus of Florida beaches ($10.23 per person) a pertinent, if not conservative, estimate

of consumer surplus of beaches in the Huntington Beach area when adjusted upward for inflation ($13.19 per person). (*Id.* at p. 12.)

Here, the revised report noted that although the beaches at Huntington Beach are more developed than the Monterey beach, the Monterey beach had many amenities that make it an equally desirable recreational attraction. Finally, after consulting with Professor Pendleton, staff determined, and the report concluded, that it was reasonable to use the $13 per person estimate of consumer value without adjustment for inflation because it probably underestimated the true consumer value of the Monterey beach. Indeed, the figure comes well within the range of consumer surplus estimates noted in the report for Cabrillo Beach and San Diego beaches.

Homeowners made no claim to the Commission suggesting, much less demonstrating, that it was inappropriate, unreasonable, or arbitrary to apply the benefit-transfer approach or adopt the Huntington Beach estimate of consumer surplus. As noted, however, it does so now based on differences in development, climate, and temperature.

Conceivably, differences in the level of development could mean that per person expenditures for *all* beach-related activities might be higher in Huntington Beach than in Monterey. However, the Commission acknowledged the higher level of development at Huntington Beach and reasonably could have concluded that it was less significant in determining consumer surplus under the travel-cost method, which, as noted, considers only transportation costs. The Commission also could have reasoned that while greater development could make a beach more desirable and popular, those attributes affect the *number* of visitors to the beach more than the amount each pays to get there. Moreover, the Commission noted that the Monterey beach had other attributes that made it attractive and popular. Accordingly, the Commission implicitly concluded that the difference in development levels did not render the Huntington Beach data inapplicable. There is no evidence to the contrary, and Homeowners fails to convince us that this conclusion was unreasonable or arbitrary.

Concerning climate and temperature, the record contains no comparison of the weather at Huntington Beach and the Monterey beach. Thus, Homeowners has no factual basis to argue that climate differences made it unreasonable to use the Huntington Beach data. Moreover, climate and temperature also appear to be considerations that, like development, would affect the number of people who go to the beach rather than the cost of getting there. Finally, as Professor Pendleton opined in his response to the Commission director's inquiry, the shorter season at Monterey beach means it has

fewer annual visitors than at Southern California beaches, which in turn suggests that the consumer value for the Monterey beach is *higher* than it is for beaches in the south.

Homeowners also claim that it was unreasonable to rely on data developed in the *American Trader* litigation because that case involved the closure of miles of beach in Southern California and this case involves a 585-foot seawall on one acre of beach in Monterey. However, Homeowners fails to explain why the differences in the location and scale of the beach impact would affect the calculation of consumer surplus or render it unreasonable to apply benefit transfer.

Last, the Homeowners' claim that there is no evidence that anyone used the beach near the complex implies that the mitigation fee had to strictly correspond to the value of recreational use that would be lost on that specific acre. However, the court in *Dolan* rejected such an exacting correspondence between mitigation and impact and instead required only rough proportionality. Here, the Commission used the average number of annual visitors to an acre of beach. We do not find this approach to be arbitrary or unreasonable. The Monterey beach is not composed of a series of discrete and separate recreational acres of sand; rather, the acre at the complex is part of an undifferentiated, long, continuous stretch of beach, all of which is equally open to recreational use by people who come to any part of it. Thus, the Commission could reasonably view the entire stretch of beach as a single recreational resource whose total consumer surplus is *evenly* distributed over its entire length and breadth. Accordingly, the average number of annual visitors per acre was an appropriate basis upon which to calculate a fee that was roughly proportional to the impact of the seawall on recreational use.

In sum, we find that the mitigation fee is supported by substantial evidence.

### STATUTORY AUTHORITY TO IMPOSE THE FEE

Homeowners contends that section 30235 gave it the right to a seawall and prescribes the only constitutionally permissible basis for a permit condition: mitigating the impact on the local sand supply. Given that statutory restriction, it argues that the Commission lacked authority to impose a mitigation fee to develop recreational opportunity elsewhere.[8]

---

[8] Although the trial court found that Homeowners forfeited this claim, it nevertheless addressed it, concluding that section 30235 did not limit permit conditions to sand-loss mitigation.

We disagree that Homeowners forfeited its claim. In a letter to the Commission, Mr. Larsen asserted that, under the Act, property owners are entitled to seawalls when necessary to protect

Section 30235 provides, in relevant part, "[S]eawalls . . . shall be permitted when required . . . to protect existing structures . . . and when designed to eliminate or mitigate adverse impacts on local shoreline sand supply."

According to Homeowners, this language required the Commission to grant the permit and restricted the type of permit conditions. Moreover, Homeowners argues that this view follows from the rule of statutory interpretation that the expression of one thing—e.g., the mitigation of sand supply—implies the exclusion of others—e.g., the mitigation of other impacts.

The Commission argues that Homeowners erroneously views section 30235 "as a stand alone provision that prohibits the Commission from considering other provisions of the Act when considering a seawall permit application." We agree.

■ The language of section 30235 is permissive, not exclusive. It allows seawalls under certain conditions: (1) when necessary to protect existing structures and (2) when they can be designed to minimize sand loss. The statute does not purport to preempt other sections of the Act that require the Commission to consider other factors in granting coastal development permits. (E.g., §§ 30604, subd. (c) [the Commission "shall" make findings that the permit complies with public access and recreational policies], 30251 [scenic and visual qualities of coastal areas "shall" be considered and protected as a resource of public importance], 30240 [environmentally sensitive habitats "shall" be protected].) Nor does the statutory language purport to limit the Commission's duty to consider other impacts and discretion to impose conditions to mitigate them. Homeowners offers no legislative history to support its view of the statute. Moreover, had it been the Legislature's intent to limit permit conditions, one would reasonably have expected direct or express limiting language—e.g., seawalls shall be permitted, and the Commission may *only* impose conditions that mitigate sand loss; or seawalls shall be permitted, and the Commission may not impose any conditions other than those that mitigate sand loss.

■ Furthermore, the rule of construction cited by Homeowners "is no magical incantation, nor does it refer to an immutable rule. Like all such

existing structures as long as there is mitigation for sand loss. He noted that the complex predated the Act, and a seawall is necessary to protect it from being undermined. He noted that Homeowners was being required to mitigate sand loss, provide alternative lateral access, and comply with other mitigation measures that are typically imposed on applicants. He also noted that Homeowners had suggested a comprehensive regional approach to sand loss and nourishment along the entire coast. We find this argument sufficient to preserve a claim that the Act limited permit conditions to the mitigation of sand loss. Ironically, however, despite taking this position, Homeowners accepted unrelated conditions concerning lateral access.

guidelines, it has many exceptions . . . ." (*Estate of Banerjee* (1978) 21 Cal.3d 527, 539 [147 Cal.Rptr. 157, 580 P.2d 657].) "The maxim does not apply where its application would run counter to a well-established principle of law [citation] or where the operation of the rule ' "would contradict a discernible and contrary legislative intent." ' " (*Burns v. California FAIR Plan Assn.* (2007) 152 Cal.App.4th 646, 656 [61 Cal.Rptr.3d 809], quoting *In re Michael G.* (1988) 44 Cal.3d 283, 291 [243 Cal.Rptr. 224, 747 P.2d 1152].)

The Act was enacted as a comprehensive scheme to govern land use planning for the entire coastal zone of California. (*Yost v. Thomas* (1984) 36 Cal.3d 561, 565 [205 Cal.Rptr. 801, 685 P.2d 1152].) Its broad goals are protection of the coastline and its resources, and maximization of public access. (*Landgate, Inc. v. California Coastal Com.* (1998) 17 Cal.4th 1006, 101 [73 Cal.Rptr.2d 841, 953 P.2d 1188].) One of its specific goals is to "maximize public recreational opportunities in the coastal zone" (§ 30001.5, subd. (c)), and it contains numerous mandatory provisions toward this end. (E.g., §§ 30210 [recreational opportunities "shall" be provided], 30211 [development "shall" not interfere with access to the sea], 30213 [recreational facilities "shall" be protected, encouraged, and provided], 30220 [coastal areas suited for recreational activities "shall" be protected].)

Homeowners's interpretation of section 30235 tends to defeat this goal. Again, Homeowners provides no evidence suggesting that the Legislature intended to give protection of the sand supply exclusive priority over all of the Act's other goals.

Finally, even if section 30235 were reasonably susceptible of Homeowners's interpretation, we would reject it as inconsistent with the Legislature's express command that the Act "be liberally construed to accomplish its purposes and objectives." (§ 30009; see *Sierra Club v. California Coastal Com.* (2005) 35 Cal.4th 839, 849 [28 Cal.Rptr.3d 316, 111 P.3d 294].)

In short, we conclude that section 30235 does not limit the type of conditions that the Commission may impose in granting a permit to construct a seawall. Rather, the Commission has broad discretion to adopt measures designed to mitigate all significant impacts that the construction of a seawall may have. (E.g., *La Costa Beach Homeowners Assn. v. California Coastal Com., supra,* 101 Cal.App.4th at p. 817 [commission has discretion to adopt appropriate mitigation measure to achieve goals of the Act even in the absence of express statutory authorization].)[9]

---

[9] In their reply brief, Homeowners emphasizes that certain buildings would be lost without a seawall. It asserts that denying a permit would constitute a taking and render the state liable

POST HOC RATIONALIZATION

Homeowners contends that the mitigation fee is invalid because it is the result of a post hoc rationalization process. It asserts that, at the first hearing, the Commission arbitrarily rejected the staff recommendation of a $1 million fee; and then, without considering or discussing which method most accurately measured the impact of the seawall, the Commission chose the $5.3 million fee solely because it wanted to get more than the $1 million recommended by staff. Then, after deciding to demand more money, the Commission simply adopted the valuation method that supported its predetermined fiscal goal. In other words, the Commission decided on the $5.3 million figure arbitrarily and then adopted a rationale for it later.

In support of its claim, Homeowners cites *Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506 [113 Cal.Rptr. 836, 522 P.2d 12] (*Topanga*), *Bam, Inc. v. Board of Police Comrs.* (1992) 7 Cal.App.4th 1343 [9 Cal.Rptr.2d 738] (*Bam*), and *Redevelopment Agency v. Norm's Slauson* (1985) 173 Cal.App.3d 1121 [219 Cal.Rptr. 365] (*Slauson*).

In *Topanga, supra,* 11 Cal.3d 506, the court explained that an administrative agency "must set forth findings to bridge the analytic gap between the raw evidence and ultimate decision or order." (*Id.* at p. 515.)

In *Bam*, Bam operated a movie arcade and was charged with operating a place where customers could masturbate. The police board appointed a hearing examiner, who, in a detailed report, found no evidence to support the charges and thus no grounds to revoke Bam's permit. The police department disagreed and recommended a 30-day suspension. At a hearing, the board perfunctorily rejected the examiner's findings and recommendations and

---

in inverse condemnation. Therefore, citing *Nollan*, it claims that since denying the permit to preserve recreational use would constitute a taking, the imposition of a mitigation fee for that purpose also constitutes a taking.

Even when we view the record liberally, we do not find that Homeowners made this claim to the Commission. Indeed, the claim has such far-reaching implications that it would have provided grounds to oppose *any* permit condition, including the conditions for access, seawall design, and sand loss mitigation. Under the circumstances, we find that Homeowners forfeited this claim.

Moreover, Homeowners failed to raise it in its opening brief, where, citing *Nollan*, it claimed only that (1) the mitigation fee failed the *Nollan-Dolan* test; and (2) the mitigation fee was unauthorized because section 30235 limited permit conditions to sand loss mitigation. The merits of the latter claim hinged on Homeowners' interpretation of section 30235.

Homeowners suggests that its new claim simply rearticulates the claim in its opening brief. We disagree and find it to be wholly different. The record fails to establish good cause for failing to raise its claim in the opening brief, and for that additional reason, we decline to address it. (*Neighbours v. Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 335, fn. 8 [265 Cal.Rptr. 788] [absent good cause, failure to raise claim in opening brief waives it].)

suspended Bam's permit for 30 days. When Bam requested findings, the board directed their preparation. However, before this was done, the board issued its decision and only later did Bam receive the proposed findings, which, however, the board never adopted. (*Bam, supra,* 7 Cal.App.4th at p. 1345.)

On appeal, the court stated, "Findings are not supposed to be a post hoc rationalization for a decision already made. To the contrary, they are supposed to 'conduce the administrative body to draw legally relevant sub-conclusions supportive of [the Board's] ultimate decision; the intended effect is to facilitate orderly analysis and minimize the likelihood that the agency will randomly leap from evidence to conclusions.' [Citation.]" (*Bam, supra,* 7 Cal.App.4th at p. 1346.) The court continued, "Indeed, it is in this context—where the decision of the hearing examiner is rejected—that findings by the Board are critical. Had the Board simply adopted the examiner's recommendation, we would have no problem deeming the examiner's findings to be those of the Board. But where, as here, the Board rejects those findings, notwithstanding that it did not hear or see the witnesses, the reviewing court has to be told why that was done; so it can 'trace and examine the agency's mode of analysis.' [Citation.]" (*Ibid.*)

In *Slauson,* a redevelopment agency wanted to obtain a large portion of Slauson's parking lot to develop housing. However, before initiating an action to condemn the property and without any notice to Slauson, the agency entered into an agreement with a developer under which it would sell bonds to buy the property and transfer the property to the developer who would then build condominiums. Thereafter, the bonds were issued and sold. (*Slauson, supra,* 173 Cal.App.3d at p. 1125.)

On appeal, the court noted that as a condition precedent to exercise of the power of eminent domain, the agency must hold a public hearing to determine whether (1) the property is necessary for a public project; (2) the project is in turn necessary for a public purpose; and (3) the taking of the particular property is compatible with the greatest public good and the least private injury. If the agency makes those determinations, then it must adopt a resolution of necessity. The court opined that the hearing and resolution requirements imply that, in arriving at a decision to condemn property, the agency must engage in "a good faith and judicious consideration of the pros and cons of the issue and that the decision to take be buttressed by substantial evidence of the existence of the three basic requirements . . . ." (*Slauson, supra,* 173 Cal.App.3d at pp. 1125–1126.)

Turning to the facts before it, the court concluded that "the hearing which led to the adoption of the resolution of necessity was a sham and the

Agency's policy making board simply 'rubber stamped' a predetermined result." (*Slauson, supra*, 173 Cal.App.3d at p. 1127.) The court noted that by the time the agency held a hearing to determine necessity, it had "by virtue of its contract with the developer and issuance of revenue bonds, irrevocably committed itself to take the property in question, regardless of any evidence that might be presented at that hearing. All the while the owner had been misled, if not deceived, as to what fate was going to befall his property." (*Ibid.*)

*Bam* and *Slauson* are distinguishable and do not suggest that the Commission's decision is invalid. Long before the hearing, the original staff report put Homeowners on notice that the Commission would consider a fee to mitigate the loss of an acre of beach as a permit condition. The report provided detailed analyses of three ways the fee could be determined, each of which took a different perspective on the nature of the loss of beach: the loss of sand; the loss of real estate; and the loss of recreational value. Staff recommended the second way, which resulted in a fee of $1 million. However, staff admitted that its recommendation provided only partial mitigation and, in light of the economic recreational value method, underestimated the impact.

Later, at the hearing, Nava echoed the staff's admission and objected to the recommendation because its focus on real estate value underestimated the value of what was really being lost: recreational value. Accordingly, he recommended that the Commission adopt the economic recreational value approach, which was fully detailed in the report. Homeowners was given an opportunity to respond. And thereafter, the Commission voted to adopt the Nava amendment.

This is not a case like *Bam*, where the police board rejected a recommendation and made the opposite decision without ever making or adopting findings that explained or supported it. Nor is this a case like *Slauson*, where, without notice to the affected party and before holding a proper hearing, the agency made an unalterable decision and then conducted a sham hearing to rubberstamp that decision.

Here, the detailed explanation of the recreational value method and the resulting fee in the staff report provided an ample factual basis and explanation for the Commission's decision to reject the staff recommendation and adopt a different methodology and fee. Although the Commission sent the report back for revisions consistent with the action taken, doing so was necessary because the original report did not reflect the Commission's findings and decision. Moreover, the revisions were relatively minor and cannot reasonably be considered a post hoc rationalization for a predetermined decision.

## DISPOSITION

The judgment is affirmed. The Commission is entitled to its costs on appeal.

Premo, J., and Elia, J., concurred.

Appellant's petition for review by the Supreme Court was denied August 13, 2008, S164866.