Filed 11/15/21; Certified for Publication 12/14/21 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| FRIENDS, ARTISTS AND NEIGHBORS OF ELKHORN SLOUGH et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> CALIFORNIA COASTAL COMMISSION, <br><br> Defendant and Respondent; <br><br> HERITAGE/WESTERN COMMUNITIES, LTD, et al., <br><br> Real Parties in Interest and Respondents. | H048088, H048409 <br> (Monterey County <br> Super. Ct. No. 18CV001000) |

## I. INTRODUCTION

Respondents Heritage/Western Communities, Ltd and Heritage Development Corporation (collectively, Heritage) sought to develop property in Monterey County. Heritage obtained the requisite government approvals, including a coastal development permit, from Monterey County.

Appellant Friends, Artists and Neighbors of Elkhorn Slough (FANS) filed an appeal with respondent California Coastal Commission (Coastal Commission) regarding Monterey County's approval of the coastal development permit. Coastal Commission staff prepared a report recommending denial of Heritage's coastal development permit

application primarily due to the lack of adequate water supply. At a public hearing on November 8, 2017, the Coastal Commission expressed disagreement with staff's recommendation and approved Heritage's permit application. Commission staff thereafter prepared written revised findings to support the commission's action, and those revised findings were later adopted by the commission on September 13, 2018.

Appellants FANS and LandWatch Monterey County (LandWatch) filed a petition for writ of mandate in the trial court, contending that the Coastal Commission's approval of the coastal development permit to Heritage violated the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.)[1] and the California Coastal Act of 1976 (Coastal Act; § 30000 et seq.). The court denied the petition and entered judgment against FANS and LandWatch.

On appeal, FANS and LandWatch contend that the trial court erred in denying the petition for writ of mandate and the Coastal Commission's approval of Heritage's coastal development permit should be set aside, because the Coastal Commission failed to complete the requisite environmental review before approving Heritage's permit application.

For reasons that we will explain, we determine that the Coastal Commission's environmental review was incomplete at the time it approved Heritage's coastal development permit application on November 8, 2017. This failure to complete the requisite environmental review before approving the application requires that the approval be vacated. We will therefore reverse the judgment and direct the trial court (1) to vacate its decision denying the petition for writ of mandate, (2) to enter a new judgment granting the petition against the commission, and (3) to issue a writ of mandate directing the commission to vacate its approval of the coastal development permit.

---

[1] All further statutory references are to the Public Resources Code unless otherwise indicated.

2

## II. OVERVIEW: COASTAL DEVELOPMENT PERMITS

"The Coastal Act 'was enacted by the Legislature as a comprehensive scheme to govern land use planning for the entire coastal zone of California. The Legislature found that "the California coastal zone is a distinct and valuable natural resource of vital and enduring interest to all the people"; that "the permanent protection of the state's natural and scenic resources is a paramount concern"; that "it is necessary to protect the ecological balance of the coastal zone" and that "existing developed uses, and future developments that are carefully planned and developed consistent with the policies of this division, are essential to the economic and social well-being of the people of this state . . . ." [Citation.]' [Citation.] The Coastal Act is to be 'liberally construed to accomplish its purposes and objectives.' [Citation.]" (*Pacific Palisades Bowl Mobile Estates, LLC v. City of Los Angeles* (2012) 55 Cal.4th 783, 793-794 (*Pacific Palisades*).)

The Coastal Act "requires local governments to develop local coastal programs, comprised of a land use plan and a set of implementing ordinances designed to promote the act's objectives of protecting the coastline and its resources and of maximizing public access. [Citations.] Once the California Coastal Commission certifies a local government's program, and all implementing actions become effective, the commission delegates authority over coastal development permits to the local government. [Citations.]" (*Pacific Palisades*, *supra*, 55 Cal.4th at p. 794.) In this case, the record reflects that Monterey County's local coastal program (LCP) was certified in 1988.

The Coastal Act generally requires that a coastal development permit be obtained for "any development in the coastal zone" in addition to obtaining any other permit required by law. (§ 30600, subd. (a); see *Pacific Palisades*, *supra*, 55 Cal.4th at p. 794.) A local government's action on a coastal development permit application may be appealed to the Coastal Commission. (See § 30603, subd. (a); *Pacific Palisades*, *supra*, at p. 794.) If the Coastal Commission on appeal "finds that the proposed development is

3

in conformity with the certified local coastal program," a coastal development permit must be issued.  (§ 30604, subd. (b).)

### III.  FACTUAL AND PROCEDURAL BACKGROUND

#### A.  *Monterey County's Approval of Coastal Development Permit*

In August 2000, Heritage/Western Communities, Ltd applied for a combined development permit, including a coastal development permit, from Monterey County for the "Rancho Los Robles Subdivision."  The proposed project was located in the northern part of the county and initially included more than 100 residential units and a commercial parcel.  Monterey County prepared an environmental impact report (EIR) for the project. The EIR contained several alternatives to the project, including an alternative that reduced the number of residential units.

In October 2008, the Monterey County Planning Commission recommended denying the project due to water supply and traffic congestion issues and because the project's benefits would not outweigh the environmental effects.  The planning commission's decision was appealed to the county board of supervisors.

In December 2008, the Monterey County Board of Supervisors disagreed with the planning commission's recommendation.  The board of supervisors approved a combined development permit (which included a coastal development permit) with 102 conditions for a staff-proposed, reduced density alternative to the project, which included only 80 residential units.[2]  The board of supervisors also certified the EIR and adopted a

---

[2]  The reduced project, as approved by the county, provided for the following: (1) the division of two parcels (33.58 acres total) into 76 lots, consisting of 68 single-family residential parcels, four duplex lots, a 1.76-acre mixed-use parcel, and 9.7 acres of common area parcel which included a 2.5-acre community recreation area with a small parking lot and two 0.5-acre miniparks; (2) the development of a commercial parcel and the construction of a four-unit apartment building above the commercial space; (3) the removal of up to 25 coastal oak trees and on-site relocation of 0.1-acre of willow trees; (4) the demolition of two single-family dwellings, two barns, and a garage, and the removal of two mobilehomes; and (5) the development on slopes greater than 25 percent.

4

statement of overriding considerations regarding significant and unavoidable traffic impacts on State Route 1 and on regional groundwater and seawater intrusion.

## B. *Appeal by FANS to the Coastal Commission*

In 2009, FANS[3] filed an appeal with the Coastal Commission regarding the county's approval of the coastal development permit.[4] A second appeal was filed by two commissioners from the Coastal Commission.[5]

In 2011, Coastal Commission staff asked Heritage whether it intended to continue pursuing the development. Commission staff indicated that they would be recommending denial of a coastal development permit for the project due to the project's inconsistencies with the LCP, including regarding water supply and potential adverse impacts to environmentally sensitive habitat areas (ESHA).[6]

In 2015, Heritage Western Communities, Ltd. indicated that it was still interested in pursuing the project, and that it was revising the project in an attempt to address the issues raised. Coastal Commission staff subsequently met with Heritage several times to discuss project issues. By mid-2017, Heritage had modified the proposed project,

---

[3] FANS describes itself as "an association of citizens committed to preserving and enhancing the Elkhorn Slough and its watershed through public education, citizen activism and advocacy."

[4] A Coastal Commission staff report noted that the county's approval of the project was appealable to the Coastal Commission because, among other reasons, the proposed development was located within 100 feet of a wetland. (See § 30603, subd. (a)(2).)

[5] An appeal to the Coastal Commission may be filed by an applicant, an aggrieved person, or any two members of the commission. (§ 30625, subd. (a).)

[6] "ESHA . . . are 'rare or especially valuable' habitat areas in the coastal zone, given enhanced protection by the Coastal Act. [Citation.]" (*Banning Ranch Conservancy v. City of Newport Beach* (2017) 2 Cal.5th 918, 936.)

including by: (1) reducing the number of residential units from 80 to 54, (2) dedicating land for future parks and other facilities, and (3) eliminating the commercial space.[7]

The Coastal Commission determined that the appeals raised a substantial issue, and the matter was set for a de novo hearing. (See § 30625, subd. (b)(2).)

**1. Coastal Commission's De Novo Review and**
**Approval of Permit Application**

**a. *2017 staff report recommending denial of coastal development permit***

In October 2017, Coastal Commission staff issued a report (hereafter 2017 staff report) that recommended denial of the coastal development permit for the project on de novo review by the commission. Commission staff described the project as being "located in the unincorporated community of Las Lomas in North Monterey County. Las Lomas is a small, rural, mostly residential community surrounded by North Monterey County's characteristic rolling hills consisting of open space, agriculture, and very low-density residential development. The project site consists of sloping hills containing 16.5 acres of oak woodland habitat and 11 acres of strawberry row-crop agricultural production."

---

[7] The modified project included 50 single-family residences and four units in duplexes. Two of the single-family residences would be reserved as "Workforce Housing for families earning up to 180% of Monterey County median income," and the duplexes would be designated as affordable rental homes. Heritage would pay the county an "affordable housing in-lieu fee" to satisfy remaining affordable housing requirements. In addition, 3.5 acres of land would be dedicated to the county for public park and recreation improvements. Also, approximately 17 acres of land would be dedicated to a to-be-formed community service district. Specific community facilities would be identified and built subject to the community service district securing funding and separate approval by the community service district in the future. The proposed commercial space was eliminated from the project. The revised project also included the demolition of one single-family residence and two barns, the removal of two mobilehomes, and the construction of roads and related improvements.

Commission staff indicated that the primary reason for the denial was the lack of adequate water supply. The project was "inconsistent with the LCP's water supply and priority land use policies," "because the project proposes to convert existing high-priority agricultural uses to allow for the construction of a low-priority 54-unit residential subdivision within a groundwater basin that is severely overdrafted." "When such a combination results," that is, a residential subdivision which is "a low-LCP-priority use" in an area "with known water supply deficiencies," "the LCP affirmatively requires the proposed development to be denied." Commission staff indicated that the project must be denied under these policies even if the proposed project would result, as argued by Heritage, in "a 'no-net increase' use of water, . . . including through proposed water offsets and retrofits to make the project 'water neutral.' "

Significantly, commission staff indicated that even if the project was consistent with the LCP regarding water supply, then the commission would still need additional information or documentation, such as project modifications and design alternatives, from Heritage addressing issues pertaining to (1) oak woodland,[8] (2) water quality, (3) visual resources and community character, (4) agricultural areas, and (5) traffic. However, because commission staff was recommending "independently denying the project based on the lack of an adequate water supply," commission staff indicated that additional information or documentation regarding these other issues was "not warranted at this time," and that any additional analysis, modification, or alternatives with respect to these other issues was rendered "moot."

Commission staff observed that the Coastal Commission was required to determine whether the coastal development permit application was consistent with CEQA. To that end, commission staff stated that "the proposed project would have

---

[8] Regarding oak woodland on a portion of the project site, commission staff determined that such oak woodland was an ESHA, and that the proposal to subdivide this area into residential lots was "not allowed within this habitat."

7

significant adverse effects on the environment" as detailed in the report's findings. "[T]o avoid the significant effects on coastal resources," denial of the project was necessary. Commission staff concluded that, by denying the project, CEQA and its requirements did not apply to the project. (See Cal. Code Regs., tit. 14, §§ 15042, 15270, subd. (a).)[9]

Heritage subsequently sent a letter dated November 7, 2017, to the Coastal Commission. The letter was more than 40 pages long and had over 400 pages of exhibits. Among other arguments in the letter, Heritage contended that the project was "water positive and will generate no net draw on the aquifer," and therefore the project "cannot cause water to be extracted at a level that exceeds its LCP-required safe yield amount." Heritage argued that if commission staff's "water related recommendations" were adopted, it would "result in a de facto moratorium" on development. Heritage also contended that commission staff had incorrectly interpreted LCP policies to require "complete avoidance of oak woodlands and a buffer around the entire habitat." Heritage contended that the policies instead allowed for oak tree removal and development within oak woodlands. Heritage further argued that the conditions included with the county's approval of the project, along with additional special conditions proposed by Heritage, provided sufficient mitigation measures.

In response to Heritage's letter, commission staff issued an addendum dated November 7, 2017, to the staff report. The addendum reiterated that "it is not enough to have a 'water neutral' (or even 'water positive') project; rather the groundwater resource itself is required to be in a safe, long-term yield condition to be able to support new residential subdivisions in North Monterey County. The LCP simply does not allow approval of residential subdivisions when the basin is in its current state of severe overdraft." Regarding oak woodland, the addendum reiterated that the LCP designated

---

[9] All further undesignated references to regulations are to title 14 of the California Code of Regulations (Regulations).

8

oak woodland as ESHA, and that subdivisions were not allowed within ESHA even if oak tree removal was minimized. Finally, the addendum reiterated that "while many of the project's LCP conformance issues could be addressed by project modifications, including with respect to avoidance of residential subdivision and development within oak woodland ESHA, on prime/productive agricultural soils, and along the ridgeline (albeit with what would most likely be a substantially reduced project size), such modifications are moot because the project is and would remain inconsistent with the LCP's water supply, groundwater resources, and priority land use policies and standards."

### b. *2017 Coastal Commission de novo hearing*

On November 8, 2017, the Coastal Commission held a public hearing in connection with its de novo review of Heritage's application for a coastal development permit. At the hearing, commission staff made a presentation and recommended denial of the permit application. Commission staff emphasized that the project consisted of a "large, suburban-style residential subdivision in a predominantly rural agricultural area with severe water supply deficiencies and on land comprised of oak woodland ESHA and productive agricultural soils." Heritage made a presentation recommending approval of the project, contending that its water balance study showed the project would be "water positive"; that the property was designated medium-density residential, not agricultural for crop farming; that development was allowed on oak woodlands; and that the project was otherwise consistent with the LCP. FANS argued against the project, contending that the project was inconsistent with the LCP as described in the report by commission staff, and that there were flaws in Heritage's water balance study. Other speakers at the hearing included LandWatch[10] which opposed the project, and a Monterey County

_____

[10] LandWatch describes itself as nonprofit public benefit corporation with the following purposes: "to promote sound land use planning and legislation at the city, County, and regional levels, to combat urban sprawl, and to promote livability in the

9

employee who had been involved in the county's review of the project and who expressed "a different perspective" than commission staff regarding water supply, ESHA, and agriculture.

The Coastal Commissioners primarily asked staff about water supply and ESHA issues. One of the commissioners expressed disagreement with the staff report regarding whether the relevant policies imposed a "moratorium" on residential development based on the condition of the aquifer, and indicated that he believed the proposed project could be approved based on evidence in the record that the project would not have the requisite impact on the aquifer. The commissioner also expressed a belief that the policy regarding ESHA and oak woodlands did not contain a "blanket prohibition" on development, and that Heritage's, not commission staff's, interpretation of the policy appeared to be correct. Another commissioner referred to the needs of "disadvantaged unincorporated communities" and indicated that the developer for this project was "very willing" to provide various amenities, including "build a park, fix the streets, [and] do some lighting," for the community.

At the conclusion of the hearing, the Coastal Commission voted seven to five in favor of approving Heritage's coastal development permit application.

### 2. Coastal Commission's Revised Findings

#### a. *2018 staff report regarding revised findings*

In August 2018, Coastal Commission staff issued a report (hereafter 2018 staff report) containing revised findings in support of the commission's approval of Heritage's

---

region's cities and towns, through public policy development, advocacy, and education," and "to preserv[e] economic vitality, high agricultural productivity, and environmental health in Monterey County by encouraging effective public participation in the land use planning process."

coastal development permit.[11]  Whereas the prior staff report recommended denial of the permit primarily due to the lack of adequate water supply, the 2018 staff report determined that water supply was no longer an issue that necessitated denial of the project, and that other LCP policies supported approval of the project.

Regarding water, commission staff acknowledged that, "in order to both protect groundwater resources and to ensure that scarce water supply remains available for priority uses," "the LCP does not allow certain development."  However, "[t]he LCP also includes policies identifying the need for affordable housing and other community goods in Las Lomas, specifically identifying Las Lomas as one of only three areas in the entire North County area appropriate for such growth given natural resource and public service capacity constraints.  In addition, the County also has argued that the LCP's water supply and groundwater resources policies should not be read as prohibiting all development in all cases when an overdraft condition exists, but rather that certain limited projects that provide needed (and LCP envisioned) community goods that are undertaken in a manner that will not adversely impact the underlying groundwater basin (i.e., will not generate a water demand exceeding or adversely impacting the safe, long-term yield of the local aquifer) can be found consistent with the LCP's overall framework.  The Commission in this case agreed based on the specific facts presented.  Specifically, because this project included on-site low and moderate income housing (as well as an in-lieu fee for additional off-site affordable housing), parks, and infrastructure improvements within the Las Lomas urban services line called out by the LCP for allowable growth, and because the [Heritage's] project-specific water balance study found the project to have a net

_____

[11] By this time, as we set forth below, FANS and LandWatch had filed their December 7, 2017 petition for writ of mandate in the trial court, challenging the Coastal Commission's approval of Heritage's project.

11

positive effect on the groundwater basin,[12] the Commission found that the project meets these LCP goals and requirements. Relying on . . . groundwater recharge conclusions [from Heritage's water balance study], the Commission found the project to be supplied by a long-term adequate water supply that would not negatively impact the underlying aquifer. These factors—the project's proposed community investments (affordable housing, parks, open space, and infrastructure improvements), within a community the LCP explicitly identifies as appropriate for such investment, and positive groundwater recharge are what differentiate it with other proposed North County residential subdivision projects the Commission has denied. Those projects were located outside of Las Lomas, did not provide the type of community goods proposed here (i.e., they were strictly residential subdivisions), and did not demonstrate positive (or even neutral) groundwater recharge. As such, the project's factset here is unique and specific due to what is being proposed and where, and the Commission approved this project as consistent with the relevant LCP policies considering these specific facts and circumstances."

---

   [12] Commission staff indicated that Heritage's water balance report showed that the project would be "water positive." Specifically, "with proposed stormwater improvements, groundwater infiltration, and water recycling, the project would actually result in a positive groundwater recharge of 7.61 [acre-feet per year] (i.e., 7.61 [acre-feet per year] more water would infiltrate the groundwater basin than the development will consume from the basin, based on . . . water usage of 18.21 [acre-feet per year] and infiltration of 25.82 [acre-feet per year] . . . . [T]he project will have a net positive effect on groundwater supplies." Further, "additional recharge associated with the project is expected to improve groundwater health." Commission staff also explained that Heritage's water balance report indicated that the proposed project's estimated use of 18.21 acre-feet per year of water was "slightly less than the current estimated water usage of 23.7 [acre-feet per year], and further indicates that the project would result in a net benefit to the aquifer even if the existing water use at the site is not taken into account. Thus, based on the Water Balance Report's findings that the project will improve groundwater aquifer health relative to the project's water usage, the Commission found that the project can be served by a long term, adequate water supply." (Fn. omitted.)

12

The staff report also addressed the other issues that had been identified as the basis for commission staff's earlier recommendation to deny approval of the permit application. For example, regarding oak woodland, the staff report explained that "the project minimized disruption and habitat loss, and also included both oak woodland restoration and preservation via dedication."[13] Regarding agricultural use, the staff report indicated that the LCP had designated the site for concentrated development, not agricultural use, and that the site was zoned for medium-density residential use. Further, "[t]he Commission also found the proposed project consistent with other LCP requirements, including with respect to water quality, visual resources, and traffic." The staff report indicated that project approval was based on certain project parameters relating to road improvements, residential siting and design features, water quality protection measures, and water use audits. Further, the county's earlier conditions of approval would also apply to the project, and those conditions were to be "adjusted where necessary" and "implemented in a manner consistent with" the parameters of the project as approved by the Coastal Commission.

Regarding the coastal development permit application's consistency with CEQA, commission staff observed that CEQA prohibited project approval if there were feasible alternatives or feasible mitigation measures that would substantially lessen any significant adverse effect the project may have on the environment (§ 21080.5, subd. (d)(2)(A)). Commission staff stated that "the project as proposed appropriately addresses any potential adverse impacts to . . . coastal resources," and that "the proposed

---

[13] Regarding the approximately 17 acres of land that would be dedicated to a to-be-formed community services district or other appropriate public entity, commission staff explained that the land was for "recreation and for habitat preservation for the remaining undeveloped oak woodland, wetland, and willow habitat areas. [Heritage] would undertake the restoration of these habitat areas and then dedicate the land . . . , but the additional specific community facilities would be identified and built subject to the [community services district] securing funding and separate . . . approval in the future."

project avoids significant adverse effects on the environment within the meaning of CEQA. As such, there are no additional feasible alternatives or feasible mitigation measures available which would substantially lessen any significant adverse environmental effects . . . ."

**b.** *2018 Coastal Commission hearing regarding revised findings*

On September 13, 2018, the Coastal Commission held a public hearing to consider revised findings to support the commission's earlier November 8, 2017 approval of Heritage's coastal development permit application. At the hearing, Heritage requested that the commission make modifications to commission staff's proposed revised findings. Heritage's proposed modifications, including regarding water, oak woodlands/ESHA, and traffic, were set forth in a September 7, 2018 letter from Heritage to the commission. Heritage contended that its proposed modifications "better reflect[ed]" the commission's earlier approval of the permit application. At the public hearing, Heritage also contended that its project, as proposed to the commission, "always included" the county's 102 conditions of approval, and that commission staff had incorporated certain specifics from those conditions into the description of the project that was contained in the staff report.

At the hearing, commission staff expressed disagreement with the modifications proposed by Heritage. Staff indicated that the proposed revised findings by staff reflected "what was presented to the Commission in November," and that staff had "tried to be as accurate as possible in that regard." Staff explained that "the commission was presented with . . . a project that would use that amount of water, and because it was using that amount of water, it would have this net positive per [Heritage's] calculations and [its] water report. And that's what we have reflected in the project description and also reflected throughout the revised findings in the report." One commissioner responded, "I don't know that we drew to a specific standard, we simply said in the aggregate, if it's neutral or positive, then we can find consistency with the LCP provision." Commission staff agreed that "that was the discussion," but that staff was

14

"trying to reflect what we thought [Heritage] was bringing forward in terms of the project . . . ."

Of the seven commissioners who originally voted in favor of the permit application, three were present at the hearing regarding revised findings. One of those three commissioners remarked: "[W]e find ourselves in a situation where the interests, generally speaking, of the Commission in terms of the permit itself and that of [Heritage] should be somewhat aligned. So it is in the interest of [Heritage] to strengthen our findings from their perspective, not to weaken them. [¶] It's also in the interest of the Commission to have the most defensible findings possible here in the interest of [Heritage] and the Commission should be aligned because the Commission granted the permit. We granted the application. [¶] . . . [P]rocedurally we neglected to notice that we needed to also mention in our motion that we should incorporate all of the recommended conditions at the time of the hearing. But as [Heritage] points out, based upon the Commission's action, I believe they are inclusive of the County conditions of approval." The commissioner later stated, "I think that generally the staff's revised findings accurately reflect the hearing, but I also think that I have no objection to the suggested modifications made by [Heritage] because I think they also in most cases -- they strengthen and broaden and add to the findings that were made by the majority at that hearing. And so I would personally have no objection to incorporating that." A second commissioner who had voted in favor the of the permit stated, "[Heritage's] revised findings do adequately reflect what my thought process was and why I voted the way I did." The third commissioner who had voted in favor of the permit stated, "I agree with my colleagues . . . that the revised findings reflect what my thought process was that day as well."

Those three commissioners, who were the only commissioners present who were eligible to vote on the revised findings, voted in favor of the staff's proposed revised findings, as modified by Heritage.

After holding the public hearing, the Coastal Commission issued its final adopted findings, which were based on the 2018 staff report and the modifications requested by Heritage. The final adopted findings included a statement by the commission that it "found the project consistent with the LCP . . . ."

The Coastal Commission issued the coastal development permit for the project on September 18, 2018. The permit indicates that it "was approved by the California Coastal Commission on November 8, 2017," which was the date of the de novo hearing.

**C.** *FANS and LandWatch's Petition for a Writ of Mandate*

In the meantime, on December 7, 2017, after the Coastal Commission had approved Heritage's coastal development permit application but before the 2018 staff report was prepared or the commission held its hearing on revised findings, FANS and LandWatch (collectively, FANS) filed a petition for writ of mandate in the trial court,[14] challenging (1) the decision by the Coastal Commission to approve the permit application and (2) the decision by Monterey County[15] to certify the EIR and approve the project. In the petition, Heritage/Western Communities, Ltd and Heritage Development Corporation were identified as real parties in interest.

The petition alleged the following three causes of action: (1) the Coastal Commission violated the Coastal Act, (2) the Coastal Commission and Monterey County violated CEQA, and (3) Monterey County violated planning and zoning requirements. Based on the alleged violations, FANS sought (1) a peremptory writ of mandate directing the Coastal Commission and Monterey County to set aside their approvals of the project and to comply with the requirements of CEQA, the Coastal Act, and/or planning and

---

[14] The petition was originally filed in Alameda County Superior Court. Heritage and Monterey County filed a motion for change of venue. The motion was granted, and the matter was transferred to Monterey County Superior Court.

[15] Monterey County is not a party to this appeal.

16

zoning provisions, and (2) injunctive relief preventing the commission, the county, and Heritage from proceeding with development of the project pending such compliance.

The Coastal Commission and Heritage each answered the petition.

**D.** *Monterey County's Demurrer and Dismissal from the Action*

Monterey County filed a demurrer to the two causes of action alleged against it—the second cause of action for violation of CEQA and the third cause of action for violation of planning and zoning provisions. Heritage joined the county's demurrer. The county and Heritage contended that the Coastal Commission "assumed exclusive jurisdiction over the project application," and that the commission's de novo review and subsequent approval of the project "superseded the [c]ounty's decision by operation of law." Thus, the county's "certification of an EIR under CEQA and approval of the project" were "no longer a proper subject for judicial review." FANS and the Coastal Commission opposed the demurrer, each contending that the commission did not have jurisdiction over the entirety of the project, and that the commission's jurisdiction was limited to the coastal development permit.

The trial court concluded that Monterey County's approval of the project, including subdivision approval and certification of the EIR, was superseded by the Coastal Commission's de novo review, and thus the county's decisions were no longer the proper subjects for judicial review. The court sustained the demurrers to the second and third causes of action against the county without leave to amend. A judgment of dismissal was entered in favor of the county on April 2, 2019.

**E.** *Denial of Petition for Writ of Mandate*

FANS filed an opening brief in support of the petition for writ of mandate regarding the remaining causes of action against the Coastal Commission. FANS argued that the petition should be granted because the Coastal Commission failed to proceed in a manner required by law. Specifically, (1) the Coastal Commission violated CEQA by failing to conduct the requisite environmental review and make the requisite findings

17

before approving the project, and (2) the commission's post-approval findings failed to state a valid basis for approving the project and constituted improper post hoc rationalizations. Both the Coastal Commission and Heritage filed opposition to the writ petition.

After a hearing on the petition, the trial court filed a statement of decision denying the petition for writ of mandate. In the statement of decision, the court made the following determinations.

First, the trial court disagreed with FANS's contention that the Coastal Commission violated CEQA by approving the project without environmental review and prior to making findings. The court determined that the 2017 staff report demonstrated that the Coastal Commission engaged in environmental review before approving the project. The court observed that the 2017 staff report included "around 30 pages of discussion and analyses of the [p]roject's potential environmental impacts," including regarding water supply, water quality, ESHA, and agriculture. The court determined that, although the commission "ultimately took an action different than that recommended in the staff report and later adopted revised findings consistent with that decision . . . , this fact does not mean [the commission] failed to conduct any environmental review in the first instance." The court also noted that "the change of direction taken by the Commission was not ultimately predicated on new and different evidence relating to the Project's environmental impacts but a different view of how the LCP policies should be interpreted relative to the evidence that had already been considered."

Second, the trial court rejected FANS's contention that the Coastal Commission failed to state a valid basis for approving the project and that the commission's revised findings constituted improper post hoc rationalizations. In making this determination, the court found that there was "a lack of clarity" and inadequate analysis regarding portions of FANS's argument, and for that reason, the court "construe[d] [FANS's] challenge as being directed solely towards the adequacy of the statements made by the commissioners

18

at the *de novo* hearing." Turning to the merits of the challenge, the court stated: "Taking together the requirement that environmental review precede project approval and the requirement that adopted findings ultimately bridge the analytic gap between evidence and the agency's decision to approve or deny a project, the Court acknowledges the tension that could arise when the Commission utilizes the procedure it employed here where it adopts revised findings after the hearing to support its decision to approve a project." The court found, however, the procedure was authorized by Regulations, section 13096. The court further concluded that "the commissioners stated the basis for their [p]roject approval in sufficient detail at the November 8, 2017 de novo hearing," such that the later prepared revised findings did not constitute improper post hoc rationalizations. In particular, the court found that the commission's final written revised findings regarding (1) water supply and (2) oak woodlands and ESHA were consistent with oral statements made by the commission at the de novo hearing before the commission voted to approve the project.

In March 2020, FANS filed objections to the trial court's statement of decision. In April 2020, FANS filed a notice of appeal regarding the trial court's statement of decision.

In June 2020, the trial court filed a judgment in favor of the Coastal Commission and Heritage on the first cause of action for violation of the Coastal Act and the second cause of action for violation of CEQA. The judgment incorporated the court's written statement of decision. The Coastal Commission filed a notice of entry of judgment on July 13, 2020. On September 4, 2020, FANS filed a second notice of appeal, this time from the judgment.

This court ordered the two appeals by FANS to be considered together for purposes of record preparation, briefing, oral argument, and disposition.

19

# IV. DISCUSSION

FANS contends that the Coastal Commission "failed to employ the proper procedures required by CEQA when it approved the [project] prior to conducting environmental review pursuant to its regulatory program." (Italics and bold omitted.) Before addressing the substance of FANS's contention, we first set forth (1) the standard of review and (2) general legal principles regarding environmental review by a certified regulatory program, such as the Coastal Commission's program for coastal development permits.

## A. *Standard of Review*

A decision by the Coastal Commission may be challenged by filing a petition for writ of administrative mandate under Code of Civil Procedure section 1094.5. (Pub. Resources Code, § 30801.) "The inquiry in such a case shall extend to the questions whether the [commission] has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the [commission] *has not proceeded in the manner required by law*, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (Code Civ. Proc., § 1094.5, subd. (b), italics added.)[16]

Relevant here, "[i]n determining whether the agency complied with the required procedures . . . , the trial court and the appellate courts essentially perform identical roles. We review the record de novo and are not bound by the trial court's conclusions. [Citations.]" (*Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection* (2008) 44 Cal.4th 459, 479; accord, *La Costa Beach Homeowners' Assn. v. California Coastal Com.* (2002) 101 Cal.App.4th 804, 814-815 (*La Costa Beach*).)

---

[16] FANS expressly indicates that it is not challenging any factual finding that would implicate the substantial evidence standard of review.

20

"[I]f the manner in which an agency failed to follow the law is shown to be prejudicial, or is presumptively prejudicial, as when the department or the board fails to comply with mandatory procedures, . . . the decision [must] be set aside . . . ." (*Sierra Club v. State Bd. of Forestry* (1994) 7 Cal.4th 1215, 1236; see *Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 515 ["failure to comply with the law subverts the purposes of CEQA" and constitutes prejudicial error "if it omits material necessary to informed decisionmaking and informed public participation"].)

B. *General Legal Principles Regarding Environmental Review by Certified Regulatory Programs*

1. **Certified Regulatory Program**

Under CEQA, the EIR "is 'the primary means of achieving the Legislature's considered declaration that it is the policy of this state to "take all action necessary to protect, rehabilitate, and enhance the environmental quality of the state." [Citation.]' [Citation.]" (*Sierra Club v. State Bd. of Forestry*, *supra*, 7 Cal.4th at p. 1229.) Generally, "[w]henever a project may have a significant and adverse physical effect on the environment, an EIR must be prepared and certified. [Citations.]" (*Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 113 (*Mountain Lion Foundation*).)

"An EIR is not required for all projects subject to governmental approval, however. The Legislature has provided that the Secretary of the [Natural] Resources Agency may certify a regulatory program of a state agency as exempt from the requirement of EIR preparation *if* the program requires that a project be preceded by the preparation of a written report containing certain information on the environmental impacts of the project. (§ 21080.5, subd. (a).)" (*Sierra Club v. State Bd. of Forestry*, *supra*, 7 Cal.4th at pp. 1229-1230; see Gov. Code, § 12805, subd. (a) ["Resources Agency" renamed as "Natural Resources Agency"].) The certified regulatory program "involv[es] essentially the same consideration of environmental issues as is provided by

21

use of EIRs and negative declarations." (Regs., § 15002, subd. (*l*).) Thus, the "state agencies, operating under their own regulatory programs, generate a plan or other environmental review document that serves as a functional equivalent of an EIR. [Citations.]" (*Mountain Lion Foundation*, *supra*, 16 Cal.4th at p. 113.)

To be certified, the regulatory program must meet the statutory criteria set forth in section 21080.5. (See, e.g., *id.*, subd. (d).) Among other requirements, the regulatory program must adopt rules and regulations that "[r]equire that an activity will not be approved or adopted as proposed if there are feasible alternatives or feasible mitigation measures available that would substantially lessen a significant adverse effect that the activity may have on the environment." (*Id.*, subd. (d)(2)(A).)[17]

The Coastal Commission's regulatory program—regarding the consideration and granting of coastal development permits under the Coastal Act—has been certified as meeting the requirements of section 21080.5. (Regs., § 15251, subd. (c).) As a result,

---

[17] The regulatory program must also adopt rules and regulations that:

"(B) Include guidelines for the orderly evaluation of proposed activities and the preparation of the plan or other written documentation in a manner consistent with the environmental protection purposes of the regulatory program.

"(C) Require the administering agency to consult with all public agencies that have jurisdiction, by law, with respect to the proposed activity.

"(D) Require that final action on the proposed activity include the written responses of the issuing authority to significant environmental points raised during the evaluation process.

"(E) Require the filing of a notice of the decision by the administering agency on the proposed activity with the Secretary of the Resources Agency. Those notices shall be available for public inspection, and a list of the notices shall be posted on a weekly basis in the Office of the Resources Agency. Each list shall remain posted for a period of 30 days.

"(F) Require notice of the filing of the plan or other written documentation to be made to the public and to a person who requests, in writing, notification. The notification shall be made in a manner that will provide the public or a person requesting notification with sufficient time to review and comment on the filing." (§ 21080.5, subd. (d)(2)(B)-(F).)

"[u]nder the terms of section 21080.5, subdivision (c), that certification expressly exempts the [coastal development permit] process from the provisions of chapters 3 and 4 and section 21167 of CEQA.  [Citation.]  Chapters 3 and 4 deal, in large part, with the various requirements of an EIR at both the state level (chapter 3) and the local level (chapter 4).  Section 21167 sets forth the time within which an action challenging a public agency's decision under the provisions of CEQA must be filed."  (*Sierra Club v. State Bd. of Forestry*, *supra*, 7 Cal.4th at p. 1230.)

Although "[a]n agency operating pursuant to a certified regulatory program" is not required to prepare an EIR, the agency is still required to "comply with all of CEQA's other requirements.  [Citations.]" (*Mountain Lion Foundation*, *supra*, 16 Cal.4th at p. 114; see Pub. Resources Code, § 21080.5, subd. (c); Cal. Code Regs., tit. 14, § 15250.) Further, "to claim the exemption from CEQA's EIR requirements, an agency must demonstrate strict compliance with its certified regulatory program.  [Citations.]" (*Mountain Lion Foundation*, *supra*, 16 Cal.4th at p. 132.)

### 2.  Functional Equivalent Document

As stated above, a state agency operating a certified regulatory program "generate[s] a[n] . . . environmental review document that serves as a functional equivalent of an EIR.  [Citations.]" (*Mountain Lion Foundation*, *supra*, 16 Cal.4th at p. 113.)  "The document used as a substitute for an EIR or negative declaration in a certified program" must include a "description of the proposed activity."  (Cal. Code Regs., tit. 14, § 15252, subd. (a)(1); see Pub. Resources Code, § 21080.5, subd. (d)(3)(A).)  Relevant here, the document must also include either: "(A) Alternatives to the activity and mitigation measures to avoid or reduce any significant or potentially significant effects that the project might have on the environment, or  [¶]  (B) A statement that the agency's review of the project showed that the project would not have any significant or potentially significant effects on the environment and therefore no alternatives or mitigation measures are proposed to avoid

23

or reduce any significant effects on the environment.  This statement shall be supported by a checklist or other documentation to show the possible effects that the agency examined in reaching this conclusion."  (Cal. Code Regs., tit 14., § 15252, subd. (a)(2)(A), (B); see Pub. Resources Code, § 21080.5, subd. (d)(3)(A)).  The functional equivalent EIR must be "available for a reasonable time for review and comment by other public agencies and the general public."  (§ 21080.5, subd. (d)(3)(B).)

Requiring specific findings about alternatives and mitigation measures "ensures there is evidence of the public agency's actual consideration of alternatives and mitigation measures, and reveals to citizens the analytical process by which the public agency arrived at its decision.  [Citations.]  Under CEQA, the public agency bears the burden of affirmatively demonstrating that, notwithstanding a project's impact on the environment, the agency's approval of the proposed project followed meaningful consideration of alternatives and mitigation measures.  [Citation.]"  (*Mountain Lion Foundation*, *supra*, 16 Cal.4th at p. 134; see *POET, LLC v. State Air Resources Bd.* (2013) 218 Cal.App.4th 681, 714 (*POET*) ["environmental review must be completed before project approval"]; *John R. Lawson Rock & Oil, Inc. v. State Air Resources Bd.* (2018) 20 Cal.App.5th 77, 98 [public agency's "required environmental review was incomplete at the time of the CEQA project approval" and therefore agency "violated CEQA's timing requirement"].)

### 3.  Coastal Commission's De Novo Review of Permit Application

As we set forth above, a local government's decision on a coastal development permit application may be appealed to the Coastal Commission.  (§ 30603, subd. (a); see *Pacific Palisades*, *supra*, 55 Cal.4th at p. 794.)  The commission considers the application de novo.  (§ 30621, subd. (a); *Security National Guaranty, Inc. v. California Coastal Com.* (2008) 159 Cal.App.4th 402, 411.)  "[I]n effect, the Commission hears the application as if no local governmental unit was previously involved, deciding for itself whether the proposed project satisfies legal standards and requirements.  [Citations.]"

24

(*Kaczorowski v. Mendocino County Bd. of Supervisors* (2001) 88 Cal.App.4th 564, 569.) The commission must determine whether the proposed development is in conformity with the certified LCP. (§ 30604, subd. (b); see § 30603, subd. (b)(1).) If it is, the commission must issue a coastal development permit. (§ 30604, subd. (b).)

The commission's regulations in effect during the relevant timeframe set forth the following procedure for reviewing an application. (See Regs., §§ 13115, subd. (b), 13321.)

### a. *Written staff report*

Prior to a public hearing, the executive director, who is appointed by the commission (Pub. Resources Code, § 30335), must "prepare a written staff report" that includes the following: (1) a description of the proposed development and the project site, (2) the significant questions of fact, (3) the applicable policies of the Coastal Act, (4) public comments regarding the application, (5) any legal issues regarding the application's compliance with the Coastal Act, (6) a copy or summary of the EIR as it relates to the issues of concern to the commission, and (7) staff's recommendation. (Cal. Code Regs., tit. 14, § 13057, former subds. (a) & (b), Register 99, No. 39 (Sept. 20, 1999); see *id.*, § 13057, subd. (a)(1)-(4).)

The staff recommendation must include: (1) "[s]pecific findings, including a statement of facts, analysis, and legal conclusions as to whether the proposed development conforms to the requirements of the Coastal Act"; (2) specific findings evaluating the conformity of the development with the requirements of Public Resources Code section 21080.5, subdivision (d)(2)(A), which provides that an activity will "not be approved or adopted as proposed if there are feasible alternatives or feasible mitigation measures available that would substantially lessen a significant adverse effect that the activity may have on the environment"; (3) responses to significant environmental points raised during the evaluation of the proposed development as required by CEQA; (4) a recommendation regarding whether the application should be granted with or without

25

conditions, or denied; and (5) if approval with conditions is recommended, then the specific conditions must be identified, along with a discussion of why the conditions are necessary to ensure the development will be in accordance with the Coastal Act. (Cal. Code Regs., tit. 14, § 13057, former subd. (c), Register 99, No. 39 (Sept. 20, 1999); see *id.*, § 13057, subd. (a)(1)-(4).)

The staff report must be distributed to Coastal Commission members, the applicant, affected cities and counties, and people who have specifically requested it, among others. (Regs., § 13059.) The staff report must be "distributed within a reasonable time to assure adequate notification prior to the scheduled public hearing." (*Ibid.*)

Written comments regarding the application or the staff report must be received at the appropriate district office. (Regs., § 13060, subd. (b).) The executive director generally must distribute the text or a summary of the communications to commission members. (*Id.*, § 13060, subds. (a) & (c).) Any person may review the written communications at the commission office during normal working ours. (*Id.*, § 13060, subd. (d).)

### b. *Public hearing*

The matter must be set for a public hearing. (Regs., § 13062.) "Evidence before the [Coastal] Commission includes, but is not limited to, the record before the local government." (*Id.*, § 13118.) At the public hearing, the "technical rules relating to evidence and witnesses" need not be followed, and "[a]ny relevant evidence shall be considered if it is the sort of evidence on which responsible persons are accustomed to rely in the conduct of serious affairs." (*Id.*, § 13065.)

Regarding the order of proceedings, the executive director must make a presentation regarding the project and include a summary of the staff recommendation. (Regs., § 13066, subd. (a)(1).) The applicant and other people supporting or opposing the application may also speak at the hearing, and the executive director and the applicant

may respond. (*Id.*, § 13066, former subd. (b)(1)-(3), Register 99, No. 39 (Sept. 20, 1999); see *id.*, § 13066, subds. (a)(2)-(4), (b) & (c).) The commissioners may ask questions following any person's presentation. (*Id.*, § 13066, subd. (e).) "At the conclusion of the public testimony portion of the public hearing, the executive director may propose to change the staff recommendation or the commission may propose to add, delete, or modify the conditions contained in the staff recommendation. The applicant and the executive director shall have an opportunity to comment briefly and specifically on any proposed change." (*Id.*, § 13066, subd. (f).)

### c. *Vote by the commission*

The commission must then vote on the permit application. (Regs., § 13066, subd. (g).) "[A] motion to grant the permit shall be deemed to include the terms proposed in the project description as modified by the applicant at the hearing and the conditions and findings proposed in the staff report as modified by staff at the hearing." (*Id.*, § 13092, subd. (a).)

"Any commissioner may move to add, delete or modify proposed terms, conditions or findings." (Regs., § 13092, subd. (b).) If "the commission moves to vote on an application with terms different from those proposed by the applicant in the application or conditions different than those proposed by the staff in the staff recommendation, the applicant, appellant, and the executive director shall have an opportunity to state briefly and specifically their views on the conditions." (*Id.*, § 13090, subd. (d).)

Voting is final upon the chairperson announcing the tally. (Regs., § 13094, subd. (c).)

### d. *Written findings supporting the commission's decision*

"All decisions of the commission relating to permit applications shall be accompanied by written conclusions about the consistency of the application with [the LCP] and [CEQA], and findings of fact and reasoning supporting the decision. The

27

findings shall include all elements identified in section 13057[, former subdivision] (c)" of the regulations regarding the content of the staff recommendation. (Regs., § 13096, former subd. (a), Register 99, No. 39 (Sept. 20, 1999); see *id.*, § 13096, subd. (a).)

"The purpose of requiring written findings is to record the grounds on which the decision of the Commission rests and thus render its legality reasonably and conveniently reviewable on appeal. [Citations.] Without appropriate written findings, the trial court cannot properly perform its function in a proceeding for administrative mandate and determine whether the agency's decision is supported by its findings and its findings are supported by the evidence. [Citation.]" (*McAllister v. California Coastal Com.* (2008) 169 Cal.App.4th 912, 941.)

Generally, "an action taken consistent with the staff recommendation shall be deemed to have been taken on the basis of, and to have adopted, the reasons, findings and conclusions set forth in the staff report as modified by staff at the hearing." (Regs., § 13096, subd. (b).)

Relevant here, "[*i*]*f the commission action is substantially different than that recommended in the staff report*, the prevailing commissioners *shall state the basis for their action in sufficient detail* to allow staff to prepare a revised staff report with proposed revised findings that reflect the action of the commission. . . ." (Regs., § 13096, subd. (b), italics added.) A public hearing must be held regarding the revised findings. (*Id.*, § 13096, subd. (c).) "The public hearing shall solely address whether the proposed revised findings reflect the action of the commission." (*Ibid.*) After the public hearing, a vote must be taken by the commission. Adoption of the revised findings "requires a majority vote of the members from the prevailing side present at the meeting of the commission, with at least three of the prevailing members present and voting." (Pub. Resources Code, § 30315.1; see Cal. Code Regs., tit. 14, § 13096, subds. (b) & (c).)

"[R]evised findings are meant to capture actions, not change them. [Citations.]" (*San Diego Navy Broadway Complex Coalition v. California Coastal Com.* (2019) 40

28

Cal.App.5th 563, 577, fn. 8; see *La Costa Beach*, *supra*, 101 Cal.App.4th at p. 819 [revised findings "reflect[ed] in writing the rationale that the Commissioners and staff *articulated on the record* at the . . . public hearing" and were not post hoc rationalizations (italics added)].)

### C. *Analysis*

FANS contends that the Coastal Commission "failed to employ the proper procedures required by CEQA" because the commission approved Heritage's coastal development permit application "prior to conducting environmental review pursuant to [the commission's] regulatory program." (Italics & boldface omitted.) FANS argues that a certified regulatory program's written document regarding environmental review (the functional equivalent of an EIR) must (1) contain certain elements, including a discussion of impacts, alternatives, and mitigation measures, and (2) be prepared before a project is approved. FANS contends that the 2017 staff report, which was prepared prior to the Coastal Commission's de novo hearing at which the commission approved the project, was inadequate because that report did not discuss alternatives or mitigation measures despite finding significant impacts. FANS argues that the subsequent 2018 staff report, which contained revised findings, could not constitute the requisite document, because it was prepared after the Coastal Commission had already approved the project. FANS contends that the 2018 staff report was "an extreme example of post hoc rationalization."

The Coastal Commission contends that its "de novo review *process* is the functional equivalent of an EIR for purposes of CEQA." According to the commission, the "de novo review process in this case involved two hearings and two versions of a report prepared by staff," that is, the de novo review and revised findings hearings, and the staff reports prepared prior to those two hearings. The Coastal Commission contends that the final adopted revised findings "memorialize the Commission's decision at the de novo hearing to approve the application for a coastal development permit, a decision it made with the benefit of full environmental review."

29

Heritage contends that the "functional equivalent document was the [Coastal] Commission's decision, as reflected in its revised findings." Heritage argues that the Coastal Commission complied with its regulations, and that "[t]here was no new or different evidence and no new or different environmental analysis or LCP determinations made following the Commission's vote to approve the [p]roject." Heritage argues that the revised findings "were not . . . a 'post-hoc rationalization,' but rather were informed by the LCP itself, [Heritage's] analysis and expert evidence, and the comments of two Coastal Commissioners who took the lead at the de novo hearing in addressing LCP inconsistency and the environmental justice benefits of the [p]roject to the Las Lomas community." Heritage contends that the prevailing commissioners at the de novo hearing determined that (1) the LCP did not create a moratorium on development when the groundwater basin is in overdraft, and the project could proceed based on evidence that the project was water neutral or water positive, and (2) the oak woodlands at the project site did not constitute ESHA.

We determine that the Coastal Commission's environmental review was incomplete at the time it approved Heritage's coastal development permit application on November 8, 2017, and that this failure to complete the required environmental review before approving the permit application requires that the approval be vacated.

Under CEQA, "to claim the exemption from . . . EIR requirements, [the Coastal Commission] must demonstrate strict compliance with its certified regulatory program. [Citations.]" (*Mountain Lion Foundation*, *supra*, 16 Cal.4th at p. 132.) This includes complying with the requirement "that a project be *preceded* by the preparation of a written report containing certain information on the environmental impacts of the project. [Citation.])" (*Sierra Club v. State Bd. of Forestry*, *supra*, 7 Cal.4th at p. 1230, italics added.) This "environmental review document that serves as a functional equivalent of an EIR" (*Mountain Lion Foundation*, *supra*, 16 Cal.4th at p. 113) must include "alternatives to the activity, and mitigation measures to minimize any significant adverse

30

effect on the environment of the activity" (Pub. Resources Code, § 21080.5, subd. (d)(3)(A); see *id.*, § 21080.5, subd. (d)(2)(A); Cal. Code Regs., tit. 14, § 15252, subd. (a)(2)(A), (B); *Pesticide Action Network North America v. Department of Pesticide Regulation* (2017) 16 Cal.App.5th 224, 245; *Strother v. California Coastal Com.* (2009) 173 Cal.App.4th 873, 878; *Schoen v. Department of Forestry & Fire Protection* (1997) 58 Cal.App.4th 556, 572).

Consistent with these requirements of CEQA, the Coastal Commission's certified regulatory program required the staff report to include findings evaluating the conformity of the development with the requirements of Public Resources Code section 21080.5, subdivision (d)(2)(A), which provides that an activity will "not be approved or adopted as proposed if there are feasible alternatives or feasible mitigation measures available that would substantially lessen a significant adverse effect that the activity may have on the environment." (See Cal. Code Regs., tit. 14, § 13057, former subd. (c)(2), Register 99, No. 39 (Sept. 20, 1999); *id.*, § 13057, subd. (a)(1), (3).) Along these lines, the staff report was also required to include a discussion of any necessary conditions for the project. (*Id.*, § 13057, former subd. (c)(4), (5), Register 99, No. 39 (Sept. 20, 1999); see *id.*, § 13057, subd. (a)(3), (4).)

These requirements of the Coastal Commission's certified regulatory program follow CEQA's "substantive mandate that public agencies refrain from approving projects for which there are feasible alternatives or mitigation measures," and that an agency not approve a project for which significant environmental effects have been identified unless the agency makes specific findings about alternatives and mitigation measures. (*Mountain Lion Foundation, supra,* 16 Cal.4th at p. 134; see §§ 21002, 21081.) A public agency "is required to carry out [this mandate] even when operating pursuant to its certified regulatory program. [Citations.]" (*Mountain Lion Foundation, supra,* at p. 134.)

31

A public agency must engage in a "meaningful consideration of alternatives and mitigation measures" before approving a project. (*Mountain Lion Foundation*, *supra*, 16 Cal.4th at p. 134; see *POET*, *supra*, 218 Cal.App.4th at p. 714 ["environmental review must be completed before project approval"].)) Requiring specific findings about alternatives and mitigation measures "ensures there is evidence of the public agency's actual consideration of alternatives and mitigation measures, and reveals to citizens the analytical process by which the public agency arrived at its decision. [Citations.]" (*Mountain Lion Foundation*, *supra*, at p. 134.)

In this case, the 2017 staff report, which was prepared prior to the Coastal Commission's approval of the project, acknowledged that "the proposed project would have significant adverse effects on the environment." The report also acknowledged that project modifications and design alternatives were necessary to address issues pertaining to (1) oak woodland, (2) water quality, (3) visual resources and community character, (4) agricultural areas, and (5) traffic. However, neither the 2017 staff report nor its addendum contained a complete analysis of mitigation measures or alternatives, as required by CEQA and the Coastal Commission's regulatory program. (Pub. Resources Code, § 21080.5, subd. (d)(2)(A), (3)(A); Cal. Code Regs., tit. 14, §§ 15252, subd. (a)(2)(A), 13057, former subd. (c)(2), Register 99, No. 39 (Sept. 20, 1999); see Cal. Code Regs., tit. 14, § 13057, subd. (a)(1), (3); *Mountain Lion Foundation*, *supra*, 16 Cal.4th at p. 134.) The 2017 staff report and addendum also did not analyze any specific conditions that were necessary for approval of the project. (Regs., § 13057, former subd. (c)(4), (5), Register 99, No. 39 (Sept. 20, 1999); see *id.*, § 13057, subd. (a)(3), (4).) Instead, because the 2017 staff report was recommending "independently denying the project based on the lack of an adequate water supply," the 2017 staff report indicated that additional information or documentation regarding these other issues (e.g., oak woodland, water quality, visual resources and community character, agricultural areas,

and traffic) was "not warranted at this time," and that any additional analysis, modification, or alternatives with respect to these other issues was rendered "moot."

At the November 2017 de novo hearing, the Coastal Commissioners primarily asked staff about water supply and ESHA/oak woodland issues. One of the commissioners expressed disagreement with staff regarding policy interpretations concerning water supply and ESHA/oak woodland. None of the commissioners made a statement that expressed a view regarding mitigation measures or alternatives, or regarding any conditions that might be necessary to approve the project.

*After* the project was approved at the November 2017 de novo hearing, Coastal Commission staff in the 2018 staff report analyzed for the first time various "components" of the project, mitigation measures, and/or conditions for the project. The 2018 staff report ultimately determined that, after "review[ing] the relevant coastal resource issues associated with the proposed project," "the project as proposed appropriately addresses any potential adverse impacts to such coastal resources." Commission staff further found "that the proposed project avoids significant adverse effects on the environment within the meaning of CEQA. As such, there are no additional feasible alternatives or feasible mitigation measures available which would substantially lessen any significant adverse environmental effects that approval of the proposed project, as modified, would have on the environment within the meaning of CEQA." This *new* environmental analysis of various "components," mitigation measures, and/or conditions for the project that "appropriately addresse[d] any potential adverse impacts to . . . coastal resources" included the following:

First, regarding habitat resources (previously referred to by commission staff as ESHA), the 2018 staff report contained a *new environmental analysis* regarding whether the proposed residential subdivision within oak woodland, including the removal of oak trees, was consistent with the LCP. The staff's new environmental analysis relied on, among other things, recommendations set forth in a forester's assessment, project

33

conditions approved by Monterey County regarding oak woodland mitigation, and the anticipated preparation of an oak woodland restoration plan. With these parameters or conditions on the project (which affected the lots regarding size, location, siting, design, bulk, and boundaries and also reduced oak tree removal), commission staff determined that the project "sufficiently minimized the amount of oak tree removal, and included measures to ensure its long-term maintenance and enhancement per the LCP."

Second, regarding water quality, the 2018 staff report contained a *new environmental analysis* regarding whether the project was consistent with applicable LCP requirements governing water quality. In its new environmental analysis, commission staff determined that water quality concerns would be sufficiently addressed by the project's proposed water quality protection measures during and after construction.[18]

Third, regarding the protection of visual resources and community character, the 2018 staff report contained a *new environmental analysis* regarding whether the project was consistent with the applicable policies. In its new environmental analysis, commission staff considered, among other matters, the siting and design of residences, vegetative screening, and the existence of and consistency with the oak woodland restoration plan. Based on the measures included in the project, commission staff determined that "the project [was] consistent with applicable visual resources and community character protection policies."

---

[18] Regarding the water quality protection measures, commission staff stated: "Specifically, as proposed, the project will include new stormwater infrastructure, including a post-construction drainage and erosion control system/detention pond designed to capture and infiltrate stormwater. The stormwater control measures will be sited and designed to the maximum extent feasible: to collect, filter, treat, and direct all site drainage and runoff in a manner designed to protect and enhance coastal resources; to prevent pollutants, including sediments, from entering coastal waters or wetlands; to retain runoff from roofs, driveways, decks, and other impervious surfaces onsite; to use low impact development BMPs; and to include maintenance and management procedures applicable for the life of the project (including with respect to any homeowners association agreements as appropriate)."

Regarding traffic, the 2018 staff report contained a *new environmental analysis* regarding whether the project was consistent with the LCP. The new environmental analysis included a discussion of "transportation improvements designed to mitigate for project traffic impacts." Commission staff determined that "the project's traffic mitigations [were] sufficient to offset its impacts consistent with the LCP . . . ." After the 2018 staff report was issued, Heritage proposed additional policy analysis to be added regarding the project's consistency with the LCP, and the Coastal Commission adopted the proposed language at the hearing on revised findings.

The 2018 staff report thus contained new environmental analysis regarding components, mitigation measures, and/or conditions for the project, and those revised findings (along with modifications proposed by Heritage) were adopted by the Coastal Commission at the September 2018 hearing. As we have explained, however, the Coastal Commission was required to consider project alternatives, mitigation measures, and conditions for the project *before* approving the coastal development permit application at the 2017 de novo hearing. (*Mountain Lion Foundation*, *supra*, 16 Cal.4th at p. 134; *POET*, *supra*, 218 Cal.App.4th at p. 714; see §§ 21002, 21081.)

The Coastal Commission's certified regulatory program does contemplate that the commission might take an "action . . . substantially different than that recommended in the staff report." (Regs., § 13096, subd. (b).) Thus, notwithstanding the 2017 staff report recommending denial of Heritage's coastal development permit application, the commission might properly take a "substantially different . . . action" and approve the application. (*Ibid.*) To properly take this action, however, the prevailing commissioners were required to "*state the basis* for their action *in sufficient detail* to allow staff to prepare a revised staff report with proposed revised findings that reflect[ed] the action of the commission." (*Ibid.*, italics added.) In this case, none of the prevailing commissioners at the 2017 de novo hearing expressed a view regarding mitigation measures or project alternatives, or regarding any conditions that might be necessary for

35

project approval. Indeed, commission staff did not provide a substantive analysis of many "components" of the project, mitigation measures, and/or necessary conditions until the 2018 staff report, which was after the project had been approved by the commission.

Our conclusion that the Coastal Commission failed to follow the proper procedure is further supported by the prevailing commissioners' statements at the hearing regarding revised findings in 2018, which was after the commission had approved the project and after FANS had filed the petition for writ of mandate in the trial court. At the 2018 hearing regarding revised findings, the prevailing commissioners discussed whether to adopt Heritage's proposed modifications to the 2018 staff report regarding revised findings. One of the commissioners remarked: "[W]e find ourselves in a situation where the interests, generally speaking, of the Commission in terms of the permit itself and that of [Heritage] should be somewhat aligned. So it is in the interest of [Heritage] to strengthen our findings from their perspective, not to weaken them. [¶] It's also in the interest of the Commission to have the most defensible findings possible here in the interest of [Heritage] and the Commission should be aligned because the Commission granted the permit. We granted the application." The commissioner subsequently stated, "I have no objection to the suggested modifications made by [Heritage] because I think they also in most cases -- they strengthen and *broaden and add to the findings* that were made by the majority at that hearing. And so I would personally have no objection to incorporating that." (Italics added.) A second commissioner stated, "[Heritage's] revised findings do adequately reflect *what my thought process was* and why I voted the way I did." (Italics added.) A third commissioner stated, "I agree with my colleagues . . . that the revised findings reflect *what my thought process was* that day as well." (Italics added.) These statements by the prevailing commissioners at the 2018 hearing support the conclusion that the commission's revised findings, including the modifications proposed by Heritage, went beyond the limited statements about policy interpretations

36

concerning water supply and ESHA/oak woodland that were expressed by the prevailing commissioners at the earlier 2017 de novo hearing when the application was approved.

In this regard, the commission's regulations require that the prevailing commissioners expressly "*state* the basis for their action in sufficient detail to allow staff to prepare a revised staff report with proposed revised findings." (Regs., § 13096, subd. (b), italics added.) As the trial court in this case observed, this provision "ensure[s] that the Commission's environmental review and reasoning occur before any action is taken as it effectively requires commissioners to set forth the analytic route between the evidence and the action *at the hearing before approval*. Put another way, the requirement that commissioners state the basis for their action in enough detail that staff can later prepare revised findings reflective of their decision is essentially a requirement that the commissioners layout the analytic route for their decision *before* the approval occurs. Under these circumstances, the revised findings are then not post hoc rationalizations but a mere 'reflect[ion] in writing' of the rationale articulated by the Commission at the hearing in which approval is granted. [Citation.]" (Fn. omitted, italics added.) In this case, the commission's 2018 revised findings went beyond the limited statements about LCP policy interpretations concerning water supply and ESHA/oak woodland that were expressed by the prevailing commissioners at the earlier 2017 de novo hearing when the application was approved, and instead the 2018 staff report and revised findings ultimately adopted by the prevailing commissioners included new environmental analysis regarding project components, mitigations measures, and/or conditions that were necessary to address potential adverse impacts to coastal resources.

The Coastal Commission and Heritage rely on various cases for the general proposition that the commission at the de novo hearing could properly reject staff's recommendation contained in the 2017 staff report. We agree with the general proposition that the Coastal Commission may reject a staff recommendation contained in a staff report. (See Regs., §§ 13096, subd. (b) [addressing the circumstance when "the

37

commission action is substantially different than that recommended in the staff report"]; 13090, subd. (d) [addressing the circumstance if "the commission moves to vote on an application with . . . conditions different than those proposed by the staff in the staff recommendation"].) However, none of the cases cited by the Coastal Commission or Heritage involves facts similar to this case, where a project with potential adverse impacts to the environment is approved before a complete analysis is conducted regarding alternatives, mitigation measures, and/or project conditions.

For example, *Ocean Harbor House Homeowners Assn. v. California Coastal Com.* (2008) 163 Cal.App.4th 215 (*Ocean Harbor*), a case cited by Heritage, is factually distinguishable in significant respects from the present case. In *Ocean Harbor*, a homeowners association sought to build a seawall to protect the association's condominium complex from erosion that threatened the complex's structural integrity. (*Id.* at p. 219.) Coastal Commission staff prepared a report recommending the grant of a coastal development permit with conditions. (*Id.* at pp. 220-221.) Because the seawall would cause an acre of beach to erode, which in turn would cause the loss of lateral access along the beach and the loss of recreational use, the staff report recommended an in-lieu mitigation fee to be used to buy beach property elsewhere for public recreational use. (*Id.* at p. 221.) The staff report "discussed three methods to determine the value of the acre of beach that would be lost and thus the amount of the mitigation fee." (*Ibid.*) The three methods were the sand-replacement method, the real estate value method, and the economic recreational value method. (*Id.* at p. 221-222.) "Each method considered the loss of beach from a different perspective." (*Id.* at p. 221.) Although the staff report recommended the second valuation method, which would result in a $1 million mitigation fee, the commission ultimately voted in favor of the third valuation method, which was estimated to result in a fee of more than $5 million. (*Id.* at p. 223-224.) The commission later adopted revised findings to reflect its action. (*Id.* at p. 225.)

38

The homeowners filed a petition for writ of mandate, contending "the fee was arbitrary and based on post hoc rationalization because the Commission first decided to increase the fee from $1 million to $5 million and then sought a justification for doing so." (*Ocean Harbor*, *supra*, 163 Cal.App.4th at p. 226.)  The trial court denied the petition, and the appellate court affirmed.  (*Id.* at p. 220.)

The appellate court explained that the staff report "provided detailed analyses of three ways the fee could be determined, each of which took a different perspective on the nature of the loss of beach: the loss of sand; the loss of real estate; and the loss of recreational value.  Staff recommended the second way, which resulted in a fee of $1 million.  However, staff admitted that its recommendation provided only partial mitigation and, in light of the economic recreational value method, underestimated the impact." (*Ocean Harbor*, *supra*, 163 Cal.App.4th at p. 245.)  A Coastal Commissioner "echoed the staff's admission," "objected to the recommendation," explained the basis for his objection, and "recommended that the Commission adopt the economic recreational value approach [(the third method)], which was fully detailed in the report." (*Ibid.*)  The commission thereafter voted to adopt the third method.  (*Ibid.*)  The appellate court found that "the detailed explanation of the [third method] and the resulting fee in the staff report provided an ample factual basis and explanation for the Commission's decision to reject the staff recommendation and adopt a different methodology and fee." (*Ibid.*)  The appellate court further found that "revisions" to the staff report "were relatively minor and cannot reasonably be considered a post hoc rationalization for predetermined decision." (*Ibid.*)

In contrast, in this case, the 2017 staff report for the de novo hearing found that the project had a water supply issue, would have significant adverse effects on the environment, and recommended denying the permit application.  Unlike the staff report in *Ocean Harbor* which contained a "detailed explanation" of three valuation methods for calculation of a mitigation fee (*Ocean Harbor*, *supra*, 163 Cal.App.4th at p. 245), the

39

2017 staff report prepared for the de novo hearing in this case did not include a complete analysis of alternatives, mitigation measures, or conditions that might be necessary for project approval. Moreover, in this case, none of the commissioners at the de novo hearing expressed a view regarding alternatives, mitigation measures, or conditions that might be necessary to address significant adverse effects the project may have on the environment, yet a majority of commissioners voted to approve the application. (Cf. *La Costa Beach*, *supra*, 101 Cal.App.4th at p. 819 [subsequent revised findings "reflect[ed] in writing the rationale that the Commissioners and staff *articulated on the record* at the . . . public hearing" and were not post hoc rationalizations (italics added)].) It was not until the preparation of the 2018 staff report that an analysis was completed regarding various project components, mitigation measures, and/or conditions that were determined necessary to avoid potential adverse impacts on coastal resources. This environmental analysis should have been completed before the commission voted to approve the project. (See, e.g., *Mountain Lion Foundation*, *supra*, 16 Cal.4th at p. 134; *POET*, *supra*, 218 Cal.App.4th at p. 714.)

We also are not persuaded by Heritage's characterization of the procedure in this case – in which the Coastal Commission "[i]n approving the [p]roject, . . . disagreed with its staff, thus requiring that the matter return to the Commission for adoption of revised findings" – as "roughly analogous to when a trial court provides its tentative ruling on a matter at a hearing and only later adopts its written order or findings setting forth its decision, either consistent with or different from the tentative." When a matter is under submission, a trial court is free to change its tentative ruling, including its reasons and ultimate decision. The Coastal Commission, however, must *complete* the requisite environmental analysis before the commission decides to approve the project at the de novo hearing, and the prevailing commissioners *must state the basis for their action in sufficient detail at that hearing* if the commission's action is substantially different than the staff recommendation. The revised findings issued thereafter should "reflect in

writing the rationale that the Commissioners . . . articulated on the record at the [de novo] hearing." (*La Costa Beach*, *supra*, 101 Cal.App.4th at p. 819.)  In this case, as we have explained, the commission's environmental analysis was incomplete at the time of the application's approval at the 2017 de novo hearing, and the subsequent 2018 staff report, which was adopted with modifications by the prevailing commissioners, contained new environmental analyses regarding the project's components, mitigation measures, and conditions in relation to potential adverse impacts to coastal resources.

We are also not persuaded by Heritage's contention that FANS failed to exhaust its administrative remedies and is barred from raising a claim that the Coastal Commission did not analyze the project's impacts regarding visual resources, agricultural resources, and transportation impacts before approving the project.  Heritage argues that FANS never raised an issue regarding impacts to these resources in the Coastal Commission proceedings or in the trial court.  Heritage primarily relies on section 21177[19] and *Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 535

---

[19]  Section 21177 states:  "(a) An action or proceeding shall not be brought pursuant to Section 21167 unless the alleged grounds for noncompliance with this division were presented to the public agency orally or in writing by any person during the public comment period provided by this division or before the close of the public hearing on the project before the issuance of the notice of determination.

"(b) A person shall not maintain an action or proceeding unless that person objected to the approval of the project orally or in writing during the public comment period provided by this division or before the close of the public hearing on the project before the filing of notice of determination pursuant to Sections 21108 and 21152.

"(c) This section does not preclude any organization formed after the approval of a project from maintaining an action pursuant to Section 21167 if a member of that organization has complied with subdivision (b).

"(d) This section does not apply to the Attorney General.

"(e) This section does not apply to any alleged grounds for noncompliance with this division for which there was no public hearing or other opportunity for members of the public to raise those objections orally or in writing before the approval of the project, or if the public agency failed to give the notice required by law."

41

[exact issue must be presented to the public agency in order to advance exhaustion doctrine's purpose of providing agency with opportunity to act before litigation occurs].)

" ' "Exhaustion of administrative remedies is a jurisdictional prerequisite to maintenance of a CEQA action." [Citation.] Subdivision (a) of . . . section 21177 sets forth the exhaustion requirement . . . .' " (*California Native Plant Society v. City of Rancho Cordova* (2009) 172 Cal.App.4th 603, 615-616 (*California Native Plant*).) The requirement is satisfied if "the alleged grounds for noncompliance with [CEQA] were presented to the public agency orally or in writing by any person during the public comment period provided by [CEQA] or before the close of the public hearing on the project before the issuance of the notice of determination." (§ 21177, subd. (a).) " 'The purpose of the rule of exhaustion of administrative remedies is to provide an administrative agency with the opportunity to decide matters in its area of expertise prior to judicial review. [Citation.] The decisionmaking body " 'is entitled to learn the contentions of interested parties before litigation is instituted.' " ' [Citation.] [¶] To exhaust administrative remedies, '[m]ore is obviously required' than 'generalized environmental comments at public hearings.' [Citation.] 'On the other hand, less specificity is required to preserve an issue for appeal in an administrative proceeding than in a judicial proceeding.' " (*California Native Plant*, *supra*, 172 Cal.App.4th at p. 616.) Generally, " 'the exhaustion requirement does not apply when the administrative procedure did not provide for a public hearing or other opportunity for members of the public to raise objections before project approval. [Citation.]' [Citation.]" (*Hines v. California Coastal Com.* (2010) 186 Cal.App.4th 830, 854; see § 21177, subd. (e).)

In this case, the 2017 staff report prepared prior to the de novo hearing did not contain a complete environmental analysis of alternatives, mitigation measures, and conditions for project approval because commission staff recommended denial of Heritage's permit application. Despite the staff recommendation to deny the application, the Coastal Commission instead approved the project at the 2017 de novo hearing.

Thereafter, and prior to the commission's hearing regarding revised findings, FANS and LandWatch in a letter to the Coastal Commission dated September 7, 2018, objected to the 2018 staff report regarding revised findings, contending that the report contained "improper after-the-fact rationalizations," was an "attempt to justify an approval that occurred without any conditions or findings in support of approval," "serve[d] as a *post hoc* rationalization for a project that was already approved on November 8, 2017," and "include[d] after-the-fact environmental review in violation of CEQA."  FANS further contended that the prevailing commissioners at the de novo hearing "failed to provide an adequate basis" for approving the project, including regarding water, ESHA, and agriculture, and that the project was approved "without conditions and without mitigations."  FANS argued that although the prevailing commissioners apparently disagreed with staff on certain policy issues, the commissioners' reasoning on those policies was "insufficient" to support approval and the "after-the-fact [s]taff [r]eport and revised findings do not cure this defect."  FANS cited to Public Resources Code section 21080.5, subdivision (d)(2)(A) [certified regulatory program's rules must require that an activity will not be approved if there are feasible alternatives or mitigation measures that would substantially lessen a significant adverse effect] and California Code of Regulations, title 14, section 13096, subdivision (b) [if commission action is substantially different than staff recommendation, then prevailing commissioners must state the basis for the their action in sufficient detail to allow preparation of proposed revised findings that reflect commission's action].

Similarly, FANS in its opening brief in support of the petition for writ of mandate filed in the trial court reiterated its contentions that the Coastal Commission failed to conduct the requisite environmental review before approving the project, and that the post-approval findings constituted improper post hoc rationalizations, again citing Public Resources Code section 21080.5, subdivision (d) and California Code of Regulations, title 14, section 13096, subdivision (b).  We further observe that Heritage, in opposition

43

to the petition by FANS, argued that the 2018 staff report regarding revised findings "fully addressed the environmental impacts of the [p]roject," and that the report included a "comprehensive review and analysis" of coastal resource issues regarding "water supply and groundwater resources," "habitat resources," "water quality," "visual resources and community character," "agriculture," and "traffic."

On this record, we determine that FANS has preserved the dispositive issue of this appeal, that is, whether the Coastal Commission failed to complete the requisite environmental review before approving Heritage's permit application at the 2017 de novo hearing (see, e.g., Pub. Resources Code, § 21080.5, subd. (d)(2)(A), (3)(A)), which includes the question of whether the prevailing commissioners sufficiently stated the basis for their action at the hearing to properly allow staff to prepare a report regarding revised findings (Cal. Code Regs., tit. 14, § 13096, subd. (b)).

We observe that FANS on appeal also contends that the 2018 staff report "is not an adequate functional equivalent document in any event" because it "fails to address alternatives," "it improperly conflates Project features and mitigation measures," and "it reverses previous conclusions without adequate explanation." As we have explained, the Coastal Commission failed to comply with the requirements of CEQA and the commission's own regulatory program when it approved Heritage's coastal development permit application without first completing an analysis of mitigation measures (including conditions on the project) and project alternatives. The 2018 staff report containing revised findings, which was prepared after project approval, does not remedy this defect in procedure. We therefore do not reach these additional issues raised by FANS.

Lastly, all the parties raise the issue of Monterey County's EIR in relation to the Coastal Commission's approval of Heritage's coastal development permit application. We do not address the issue further, as (1) FANS contends that the commission "did *not* truly rely on the County's EIR," (2) the commission contends that its approval of the permit application was proper "*without* the County's EIR," and (3) Heritage

44

acknowledges that, notwithstanding the existence of the county's EIR, the commission was required to "reach[] its *own* conclusions on whether and how to approve the project." (Italics added.)

In sum, the record reflects that the Coastal Commission did not complete an analysis of mitigation measures (including conditions for the project) or alternatives, as required under CEQA and the commission's certified regulatory program, until the 2018 staff report was prepared, which was after the project had already been approved. Under these circumstances, we conclude that the commission failed to comply with the requirements of CEQA and the commission's own regulatory program by approving Heritage's coastal development permit application without first completing an analysis of mitigation measures (including conditions for the project) and alternatives. Because the commission did not proceed in accordance with the procedures mandated by law, the commission abused its discretion in approving the permit application. (Code Civ. Proc., § 1094.5, subd. (b); see *Mountain Lion Foundation*, *supra*, 16 Cal.4th at p. 137 ["failure to proceed in accordance with law presumptively prejudicial when mandatory procedures not followed"], citing *Sierra Club v. State Bd. of Forestry*, *supra*, 7 Cal.4th at pp. 1235-1237; *Sierra Club v. County of Fresno*, *supra*, 6 Cal.5th at p. 515 ["failure to comply with the law subverts the purposes of CEQA" and constitutes prejudicial error "if it omits material necessary to informed decisionmaking and informed public participation"].)

## V. DISPOSITION

The judgment is reversed. On remand, the trial court is directed (1) to vacate its decision denying the petition for writ of mandate, (2) to enter a new judgment granting the petition against the California Coastal Commission, and (3) to issue a writ of mandate directing the commission to vacate its approval of the coastal development permit application. Appellants Friends, Artists and Neighbors of Elkhorn Slough and LandWatch Monterey County shall recover their costs on appeal.

45

_____
BAMATTRE-MANOUKIAN, J.


WE CONCUR:




_____
ELIA, ACTING P.J.




_____
DANNER, J.




*Friends, Artists and Neighbors of Elkhorn Slough v. California Coastal Commission*
**H048088**
**H048409**

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT


| | |
|---|---|
| FRIENDS, ARTISTS AND NEIGHBORS OF ELKHORN SLOUGH et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> CALIFORNIA COASTAL COMMISSION, <br><br> Defendant and Respondent; <br><br> HERITAGE/WESTERN COMMUNITIES, LTD, et al., <br><br> Real Parties in Interest and Respondents. | H048088, H048409 <br> (Monterey County <br> Super. Ct. No. 18CV001000) <br><br> ORDER CERTIFYING OPINION <br> FOR PUBLICATION |


THE COURT:

The opinion in the above-entitled matter filed on November 15, 2021, was not certified for publication in the Official Reports. The Coastal Environmental Rights Foundation; Remy Moose Manley LLP; the Planning and Conservation League, Building a Better Redondo, Penny Elia, and the Environmental Defense Center; appellants Friends, Artists and Neighbors of Elkhorn Slough and LandWatch Monterey County; and Citizens Preserving Venice request the opinion be certified for publication. Under California Rules of Court, rule 8.1105(c), the opinion is ordered published.

_____

BAMATTRE-MANOUKIAN, J.

_____

ELIA, ACTING P.J.

_____

DANNER, J.

***Friends, Artists and Neighbors of Elkhorn Slough v. California Coastal Commission***
**H048088**
**H048409**

Trial Court:                                    Monterey County Superior Court
                                                Superior Court No.: 18CV001000


Trial Judge:                                    Hon. Lydia Villarreal


Attorneys for Plaintiffs and Appellants:        William P. Parkin
Friends, Artists and Neighbors of Elkhorn       Yuchih Pearl Kan
Slough; Landwatch Monterey County               Wittwer Parkin LLP

                                                Molly E. Erickson
                                                Michael W. Stamp
                                                Stamp | Erickson


Attorneys for Defendant and Respondent:         Rob Bonta
California Coastal Commission                    Attorney General of California
                                                Daniel A. Olivas
                                                Senior Assistant Attorney General
                                                David G. Alderson
                                                Supervising Deputy Attorney General
                                                Susan A. Austin
                                                Deputy Attorney General


Attorneys for Real Parties of Interest and      Steven Harold Kaufmann
Respondent:                                     Nossaman LLP
Heritage/Western Communities Ltd and
Heritage Development Corporation                 Mark A. Blum
                                                Horan Lloyd, A Professional Corporation

***Friends, Artists and Neighbors of Elkhorn Slough v. California Coastal Commission***
**H048088**
**H048409**